STATE OF CONNECTICUT *v.* WILLIAM DAUGAARD
(14859)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

Argued March 22—decision released August 23, 1994

*Brian S. Carlow,* assistant public defender, with whom, on the brief, was *John E. MacDonald,* certified legal intern, for the appellant (defendant).

*John A. East III,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Mary Elizabeth Baran,* assistant state's attorney, for the appellee (state).

BORDEN, J. The principal issue in this certified appeal is whether the improper admission by the trial court of testimony detailing the defendant's invocation of various constitutional rights was harmless beyond a reasonable doubt. The defendant, William Daugaard, was convicted[1] after a jury trial of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1).[2] He appealed from the judgment of conviction to the Appellate Court, which affirmed the judgment. *State* v. *Daugaard,* 32 Conn. App. 483, 630 A.2d 96 (1993). We granted the defendant's petition for certification.[3] We affirm the judgment of the Appellate Court.

---

[1] The defendant was acquitted of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), and its lesser included offenses of kidnapping in the second degree in violation of General Statutes § 53a-94, and unlawful restraint in the second degree in violation of General Statutes § 53a-96.

[2] General Statutes § 53a-70 provides in relevant part: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY . . . . (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[3] Specifically, we certified the following questions for review: (1) "Whether the Appellate Court was correct in concluding that the timing of the disclosure of the police report during the trial did not violate the defendant's

The jury could have reasonably found the following facts. At approximately 5 p.m. on May 30, 1990, the defendant, accompanied by a friend, Michael Murray, commenced an evening of bar hopping. The defendant had been drinking earlier in the day, and Murray observed that the defendant appeared close to being drunk by early in the evening, prior to visiting any bars.

From approximately 5 to 6 p.m., the two men went to three bars in the greater New Haven area. They traveled in an unregistered automobile belonging to the defendant's sister that the defendant had taken without his sister's permission. Upon leaving the third bar, Murray drove because of the defendant's intoxicated condition. During this trip, the defendant discovered in the automobile one-half gallon of vodka, which he immediately started to consume.

Murray and the defendant next went to Monahan's Shamrock Cafe in West Haven. While drinking at Monahan's, the defendant repeatedly told Murray that he had to "get laid" that evening. Consequently, at approximately 8:30 p.m., the defendant and Murray left the tavern to visit the homes of two female acquaintances of the defendant. Neither visit achieved the defendant's stated objective: at the first home visited by the two, the defendant's female acquaintance was leaving as the two men arrived; at the second, the woman was not at home. During the trip to the homes of these two women, the defendant continued to drink vodka straight from the bottle that he had discovered in his sister's automobile.

At approximately 10 p.m., the two men returned to Murray's first floor apartment in New Haven. At Mur-

due process rights?"; and (2) "Whether the Appellate Court was correct in determining that the erroneous admission by the trial court of testimony detailing the defendant's invocation of various constitutional rights was harmless beyond a reasonable doubt?" *State* v. *Daugaard,* 228 Conn. 905, 906, 634 A.2d 298 (1994).

ray's apartment, the defendant continued to drink vodka directly from the bottle. A female friend of Murray's, Kristen Anderson, telephoned after the two had returned. At the instigation of the defendant, Murray invited Anderson and her roommate to his apartment. Anderson's roommate did not accept, but Anderson indicated her willingness to join the two men. Murray and the defendant left Murray's apartment to pick up Anderson at her apartment. All three returned to Murray's apartment at approximately 11 p.m.

Upon their return to Murray's apartment, the three encountered the victim, who was sitting on the front steps of the apartment building. The victim, who had previously been Murray's girlfriend,[4] was eighteen years old, and lived alone in a second floor apartment in the same building. Both Murray and Anderson were friends of the victim. The victim had never met the defendant. Murray introduced the victim to the defendant, and invited her to join the threesome in his apartment for a drink.

The victim accepted Murray's invitation. Inside the apartment, for approximately one and one-half hours, the four sat around Murray's kitchen table drinking and listening to music. During this period the victim consumed two drinks. The defendant continued to consume straight vodka from the bottle he had discovered in his sister's automobile. When the liquor ran out, the vic-

---

[4] There was conflicting testimony at trial as to the then current state of the relationship between the victim and Murray. At trial, the victim testified repeatedly that she was Murray's former girlfriend on the night in question, having previously terminated their romantic involvement and moved to her own apartment some time between one week and one month prior to the sexual assault. According to the victim, however, the two had remained friends following her move, and she and Murray had had sexual intercourse approximately three days before the night in question. Murray testified that the two were boyfriend and girlfriend at the time of the sexual assault. The victim told one police officer on the night of the incident that Murray was her boyfriend.

tim stated that she knew of an after-hours club, approximately thirty minutes away, where additional liquor could be purchased. After some discussion, it was decided that the defendant, who had access to an automobile, and the victim, who knew the location of the after-hours club, would go to the club to purchase additional liquor. Murray and Anderson planned to wait for them to return.

Between 12:30 and 1 a.m., the victim and the defendant left Murray's apartment bound for the after-hours club. Initially, the victim was driving the defendant's sister's automobile, because the defendant was intoxicated. After the victim had been driving for approximately five minutes, however, the defendant grabbed the steering wheel and forced the automobile to the side of the road. The defendant told the victim that he wanted to drive because his sister's automobile was unregistered. The victim then acceded to this demand, and the two switched seats in the automobile. The victim began to give the defendant directions as he drove. After a period of time, the victim noticed that the defendant was ignoring her directions. The defendant stated that he was taking a shortcut to the club.

The defendant subsequently drove onto a highway that the victim did not recognize. She became frightened and demanded that the defendant drive her back to Murray's apartment. The defendant stated that she "wasn't going anywhere" and that he was "taking her to Las Vegas to be a prostitute." The victim continued to protest. The defendant then struck her in the face, grabbed her neck and forced her head under the dashboard of the automobile. The defendant then warned the victim to keep her head down and not look where they were going.

The victim, who was terrified by this conduct, was crying and begging the defendant to release her. The

defendant continually threatened the victim with physical harm. Each time the victim raised her head, the defendant struck her and forced her head back under the dashboard. He also told her that the only way she could get out of the automobile was to jump.[5] The defendant eventually left the highway, driving to a secluded location on a narrow road lined by tall weeds. The defendant drove the automobile into the weeds to conceal it. The defendant then told the victim that he was "going to fuck her and make her suck his dick and that she would enjoy it, and that she would beg for more."

The defendant then pulled the victim into the back seat of the automobile, pulled off her pants, and had forcible vaginal intercourse with her. After ejaculating, the defendant climbed off the victim and told her that he was going to kill her and leave her body in the weeds. The defendant then began to search for a place to dispose of the victim's body.

The victim begged the defendant not to kill her. She promised not to report the sexual assault to the police if the defendant did not kill her. The defendant agreed to release the victim, but threatened to kill both her and Murray if she told of her sexual assault to anyone. The defendant then told the victim "to get the hell out of here before [he] change[d] [his] mind." The victim made her way to an unfamiliar highway, and began hitchhiking. She was picked up by a man who, at her request, dropped her off on Columbus Avenue in New Haven, three houses from the building in which she lived. She did not get out in front of her building because she was afraid that the defendant might be lying in wait for her there.

---

[5] The victim did, at one point, open the car door in an attempt to escape from the automobile. She abandoned this effort because the defendant was driving the automobile at speeds in excess of sixty miles per hour.

Upon entering her building, the victim had no intention of telling anyone about the sexual assault. This intention was a result of her embarrassment and her fear that the defendant would kill her if she informed anyone of what had occurred. The victim went to Murray's apartment, because she knew that Murray and Anderson would be waiting for her to return, and because she did not wish to be alone. The victim had family in New Haven to whom she could have gone.

When the victim entered Murray's apartment at approximately 6 a.m., both Murray and Anderson immediately noticed that something had happened to her. The two observed that the victim was crying and shaking, she was having difficulty standing, she appeared to be in pain, she had a bruise on her face, and her clothing, hair and makeup were in disarray. Upon entering the apartment, the victim exclaimed to Murray: "nice fucking friends you got."

Murray then asked the victim if she had been raped by the defendant. The victim initially refused to tell Murray and Anderson what had occurred. After a thirty minute discussion, Anderson and Murray convinced the victim to tell them what had happened. After the victim told the two of the sexual assault, Murray called a local rape crisis center and the West Haven police department. The victim was taken by the West Haven police to the Yale-New Haven Hospital emergency room.

The victim was examined and treated by the hospital staff, including Carla Williams, a resident physician specializing in gynecology. According to Williams, the findings of her examination of the victim were consistent with sexual assault. On cross-examination, Williams indicated that her findings after examining the victim were not consistent with consensual sexual intercourse.

The victim was interviewed by two detectives from the Wallingford police department, Theodore Milewski and Patricia Miranda. Subsequent to her release from the hospital, Milewski and Miranda drove the victim around in an unsuccessful attempt to locate the scene of the sexual assault. During this drive they observed that the victim remained crouched in a fetal position, and sobbed intermittently.

The defendant was arrested at his sister's home on May 31, following a complaint by his sister that he had used her automobile without her permission. While he was incarcerated in connection with the unauthorized use of his sister's automobile,[6] the defendant was questioned by detectives from the Wallingford police department. Following this interview, the defendant was arrested for and charged with sexually assaulting the victim. Several days following his arrest, the defendant admitted to his sister that he had "fucked up" on the night the victim had been sexually assaulted and that he "remembered hitting [the victim] once" that evening.

Additional facts will be discussed as they pertain to the specific claims of the defendant.

I

The first certified question addresses the timing of the disclosure of a certain police report during the defendant's trial. The defendant claims that the Appellate Court improperly determined that the timing of the disclosure of the police report to the defendant did

---

[6] The defendant was arrested by officers from the West Haven police department in connection with the improper use of his sister's automobile. Because there was some evidence that the sexual assault had occurred in the vicinity of Wallingford, the investigation of the sexual assault was conducted by the Wallingford police department, and the defendant was interviewed at the West Haven police station by officers from the Wallingford police department.

not violate his due process rights under the fourteenth amendment. He argues that, because the contents of the police report were not disclosed to him prior to the victim's return to California where she was living at the time of trial, he was precluded from using the report effectively in cross-examining the victim, in violation of his due process rights. We disagree.

The following facts are relevant to this claim. The victim testified at trial on May 29, June 5 and June 6, 1991, approximately one year after the crime. Upon completion of her direct testimony, the state provided the defendant with a copy of the victim's formal statement pursuant to General Statutes § 54-86b[7] and Practice Book § 752.[8] The defendant then conducted a voir dire of the victim to determine if any additional discoverable materials existed in addition to those that had already been disclosed to the defendant. Following the voir dire, the defendant subpoenaed all the reports that had been prepared by the Wallingford police department in connection with its investigation of this matter. The reports were duly delivered to the

[7] General Statutes § 54-86b provides: "RIGHT OF ACCUSED TO EXAMINE STATEMENTS. (a) In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use.

"(b) If the prosecution fails to comply with the order of the court, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

[8] Practice Book § 752 provides: "— —PRODUCTION FOLLOWING TESTIMONY

"After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

trial court on May 30. The trial court ordered that they be sealed and marked as a court's exhibit.

The defendant moved that the trial court conduct an in-camera review of the sealed reports in order to determine if the defendant was entitled to any of them pursuant to an earlier discovery order of the court. The court denied this motion. The defendant then conducted an extensive cross-examination of the victim, covering portions of three days, and consuming 133 pages of the transcript. Following the completion of her testimony, the victim returned to her home in California.

In her trial testimony, and in her formal statement to the police, the victim consistently stated that the sexual assault had occurred along a secluded road lined with tall swamplike weeds, and that an unfamiliar highway, upon which the victim and the defendant had driven, had been visible in the distance.

Following the victim's testimony, the state called Detective Miranda to testify. Miranda and Detective Milewski had accompanied the victim in an effort to find the location of the sexual assault. At the completion of Miranda's testimony, the state provided the defendant with two narrative reports that Miranda had prepared.[9] One of these reports stated, inter alia, that while Miranda, Milewski and the victim had been looking for the site of the sexual assault, the victim had mentioned that she believed the site was *"in* a rest area off the highway, which had a tourist information center [in it]." (Emphasis added.) On cross-examination, Miranda testified that this report had been in error, and that the victim actually had said that the sexual assault had taken place "near" a rest stop area, not "in" a rest stop area as she had noted in her report.

---

[9] Miranda's reports had been delivered previously to the trial court pursuant to the previously discussed subpoena and had been sealed by the trial court.

In a second narrative report that Miranda had prepared, she noted that the victim had stated that the defendant had driven through a rest area on a highway prior to the sexual assault.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Milner,* 206 Conn. 512, 539–40, 539 A.2d 80 (1988). The parameters of *Brady* were delineated by the United States Supreme Court in *Moore* v. *Illinois,* 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972). "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." Id.; *State* v. *Shannon,* 212 Conn. 387, 406, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989); *Demers* v. *State,* 209 Conn. 143, 150, 547 A.2d 28 (1988). To prevail on a *Brady* claim, the defendant must establish all three elements of this test. *State* v. *Green,* 194 Conn. 258, 263, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985); *State* v. *Doolittle,* 189 Conn. 183, 197, 455 A.2d 843 (1983). The prosecutor does not violate his constitutional duty of disclosure " 'unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.' " *State* v. *Green,* supra, 263–64. Suppressed evidence is material if it " 'creates a reasonable doubt [of guilt] that did not otherwise exist

. . . .' " Id., 264, quoting *United States* v. *Agurs,* 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States* v. *Agurs,* supra, 109–10; see *State* v. *Doolittle,* supra, 197.

In circumstances in which evidence is disclosed to the defendant at trial, the defendant must establish that he was prejudiced by the state's failure to make the information available to him at an earlier time. *State* v. *Reddick,* 197 Conn. 115, 121–22, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). "The appropriate standard to be applied in a case such as this is whether the disclosure came so late as to prevent the defendant from receiving a fair trial." (Internal quotation marks omitted.) Id. "[T]he omission [of disclosure] must be evaluated in the context of the entire record . . . . [I]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial . . . ." (Internal quotation marks omitted.) *State* v. *Green,* supra, 194 Conn. 264; *State* v. *Packard,* 184 Conn. 258, 279, 439 A.2d 983 (1981).

In determining whether the defendant was prejudiced by late disclosure, this court focuses on the effect of the late disclosure on the jury's verdict. See *State* v. *Pollitt,* 199 Conn. 399, 414, 508 A.2d 1 (1986). "The focus is not on the fact of nondisclosure, but the impact of the nondisclosure on the jury's verdict." Id.; *United States* v. *Kubiak,* 704 F.2d 1545, 1550 (11th Cir. 1982), cert. denied, 464 U.S. 852, 104 S. Ct. 163, 78 L. Ed. 2d 149 (1983). "The effect then of disclosable evidence should be viewed in terms of its likely effect upon those on whom the outcome rests—the jury." *State* v. *Pollitt,* supra, 414.

The defendant claims that the timing of the disclosure of Miranda's report, following the victim's testimony, violated his due process rights, because it prevented him from cross-examining the victim on the inconsistency between her direct testimony and the statement she purportedly made to Miranda that was memorialized in the report.[10] He argues that the timing of the disclosure, subsequent to the victim's testimony, prevented him from attacking her credibility by confronting her with an inconsistent statement, namely, that the assault took place, not in an area of tall weeds as she had testified, but in a rest stop area.

The report was not material to the defendant within the meaning of *Brady*. The level of materiality required to establish a *Brady* violation is that the omitted evidence, considered in the context of the entire trial, "creates a reasonable doubt [as to guilt] that did not otherwise exist . . . ." *United States* v. *Agurs,* supra, 427 U.S. 112; *State* v. *Green,* supra, 194 Conn. 265. Although the defendant claims that the report could have been used for impeachment purposes, any such use was likely to have been extremely limited. The report does not directly contradict the victim's testimony or her formal statement to the police. Miranda explained the inconsistency between the victim's testimony and one of her two reports as resulting from her own error in recordation. Such evidence is not of the type that would cause a jury to question, in any significant way, the credibility of the victim.

Furthermore, the victim's testimony that the defendant had sexually assaulted her was supported by cor-

[10] The record indicates that the defendant returned to her home in California immediately after her testimony, and that a motion by the defendant to compel the state to produce the victim and to reopen her cross-examination was denied. The Appellate Court specifically addressed that denial; *State* v. *Daugaard,* supra, 32 Conn. App. 490; and it is not a subject of this appeal.

roborating testimony and physical evidence consistent with a determination of sexual assault. As was noted above, the victim's testimony and the statement in the report were not directly contradictory. The specific location of the assault, as opposed to whether it in fact took place, was not at issue in the trial. Furthermore, the defendant's cross-examination of the victim, aimed at undermining her credibility, was extensive and unbridled. Finally, all of the evidence offered by the defendant in defense was aimed at the victim's credibility.

Although the material contained in the report could arguably have furnished additional grist for the defendant's cross-examination mill, upon examination of the entire record, we conclude that the report, had it been furnished to the defendant earlier, would not have created a reasonable doubt concerning his guilt. The Appellate Court concluded that there was not a reasonable probability that had the report been disclosed to the defendant prior to the victim's return to California, the result of the trial would have been different. State v. Daugaard, supra, 32 Conn. App. 495. The defendant provides us with no persuasive reason to disturb that conclusion, and we decline to do so.

## II

The second certified question addresses whether the improper admission by the trial court of testimony regarding the defendant's invocation of certain constitutional rights was harmless beyond a reasonable doubt. The defendant claims that the Appellate Court improperly determined that the admission at trial of testimony by Wallingford police department detectives Milewski and Patrick Shanley that the defendant had refused to consent to a warrantless body search, had refused to waive any rights, and had desired to speak with an attorney, was harmless error. We disagree.

The following facts are relevant to this claim. As was noted previously, following a complaint by the defendant's sister that the defendant had used her automobile without her permission in violation of General Statutes § 53a-119b, the West Haven police arrested the defendant on the morning following the sexual assault of the victim. The West Haven police were aware at the time that the defendant was a suspect in the sexual assault of the victim that had occurred the previous evening. The West Haven police thereafter informed the Wallingford police that the defendant was in their custody. At approximately 6:30 p.m., Milewski and Shanley arrived at the West Haven police department to interview the defendant. The detectives introduced themselves and told the defendant that he was a suspect in a sexual assault that they were investigating. The defendant was then taken out of his cell to be interviewed.

After being taken from his cell, the defendant asked the detectives to tell him again where they were from. Immediately after the detectives again told the defendant that they were from Wallingford, the defendant exclaimed "it didn't happen, man."

Following this exclamation, Milewski immediately cautioned the defendant and read him his *Miranda*[11] rights. The detectives then asked the defendant if he understood his rights. The defendant told the detectives that he understood his rights, and nodded his head affirmatively. The defendant was then asked if he

[11] The warnings mandated by *Miranda* v. *Arizona,* 384 U.S. 436, 467–73, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are that, once the police take a person into custody, before commencing interrogation they must advise him that he has the right to remain silent and that anything he says can be used against him. He must also "be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation . . . ." Id., 471; *State* v. *Hull,* 210 Conn. 481, 489, 556 A.2d 154 (1989).

wished to waive his rights. He responded that he would not give up any rights.

The defendant then reinitiated the conversation with the detectives by asking Shanley when the sexual assault had occurred. Shanley responded, and the defendant stated "it couldn't have happened that way," explaining that he was in Monahan's bar from 7 p.m. until closing, with the bartender, Joe Denehy and a man named Mark. The defendant also stated that "when I left [Monahan's] I was too drunk to remember what I did later."

The detectives then asked the defendant to consent to a physical search in order to provide them with hair and saliva samples. The defendant refused this request. Shanley then asked the defendant if he knew a girl with the victim's name. The defendant responded "no," and then asserted his right to speak to a lawyer. Upon this assertion the detectives immediately terminated the interview. Subsequently, the defendant was arrested in connection with the sexual assault.

At trial, both Milewski and Shanley testified, over the defendant's objection, regarding their interview with the defendant. In relating their conversation with the defendant, both detectives testified that the defendant: (1) had indicated he would not waive any rights; (2) had refused to consent to a body search; and (3) had requested to speak to a lawyer, prompting termination of the interview. The defendant did not testify at trial.

Pursuant to the certified question, we assume that the admission of the detectives' testimony that the defendant would not waive his right to remain silent, requested a lawyer, and would not consent to a body search, was improper.[12] Ordinarily, evidence of a

[12] The state does not present, and we do not consider, as an alternate ground for affirmance, whether the admission of the detectives' testimony was constitutionally permissible as, for example, demonstrative of "the

defendant's postarrest and post-*Miranda* silence is constitutionally impermissible under the due process clause of the fourteenth amendment. *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).[13] A *Doyle* violation also encompasses a prosecutor's comment upon a defendant's statement requesting an attorney. *State* v. *Hull,* 210 Conn. 481, 489, 556 A.2d 154 (1989). "With respect to post-*Miranda* warning . . . silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." (Internal quotation marks omitted.) *Wainwright* v. *Greenfield,* 474 U.S. 284, 295 n.13, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986); *State* v. *Green,* supra, 194 Conn. 269.

*Doyle* violations are, however, subject to harmless error analysis. *South Dakota* v. *Neville,* 459 U.S. 533,

---

investigative effort made by the police and the sequence of events as they unfolded . . . ." (Internal quotation marks omitted.) *State* v. *Casey,* 201 Conn. 174, 183, 513 A.2d 1183 (1986); *State* v. *Moye,* 177 Conn. 487, 496, 418 A.2d 870, vacated, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129, on remand, 179 Conn. 761, 409 A.2d 149 (1979); or when a police officer briefly describes what has occurred when the defendant has been interviewed at the police station. *State* v. *Casey,* supra, 183; *State* v. *Moye,* supra, 496.

[13] Evidence that the defendant refused to consent to a body search is not analytically the same as the invocation of the right to silence following *Miranda* warnings. Whether the state can perform a body search implicates the fourth amendment's protection against unreasonable searches and seizures, whereas the right to remain silent following *Miranda* warnings derives from the fifth amendment. The two analyses may differ because the refusal of a request to consent to a body search, unlike the invocation of the fifth amendment right to silence following *Miranda* warnings, is not ordinarily preceded by an implicit promise to the defendant by the police that no adverse consequences will flow from the defendant's assertion of his constitutional rights. Because the form of the certified question assumed equivalence between these two situations, however; see footnote 3; and because we conclude that the outcome of the case would not differ based upon that assumption, we need not decide whether the consequences flowing from evidence of a refusal to submit to a body search would be the same as the consequences flowing from evidence of the invocation of the right to silence.

103 S. Ct. 916, 74 L. Ed. 2d 748 (1983); *State* v. *Canty,*
223 Conn. 703, 613 A.2d 1287 (1992); *State* v. *Hull,*
supra, 210 Conn. 492. The harmless error doctrine is
rooted in the fundamental purpose of the criminal jus-
tice system, namely, to convict the guilty and acquit
the innocent. *Bunkley* v. *Commissioner of Correction,*
222 Conn. 444, 460, 610 A.2d 598 (1992). Therefore,
whether an error is harmful depends on its impact on
the trier of fact and the result of the case. *State* v. *Jones,*
215 Conn. 173, 185, 575 A.2d 216 (1990).

"[B]efore a federal constitutional error can be held
harmless, the court must be able to declare a belief that
it was harmless beyond a reasonable doubt." *Chapman*
v. *California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed.
2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18
L. Ed. 2d 241 (1967); *State* v. *Pittman,* 209 Conn. 596,
608–609, 553 A.2d 155 (1989); *State* v. *Plourde,* 208
Conn. 455, 469, 545 A.2d 1071 (1988); *State* v. *Green,*
207 Conn. 1, 9, 540 A.2d 659 (1988). The state bears
the burden of demonstrating that the constitutional
error was harmless beyond a reasonable doubt. *State*
v. *Colton,* 227 Conn. 231, 253–54, 630 A.2d 577 (1993).
That determination must be made in light of the entire
record. See *State* v. *Francis,* 228 Conn. 118, 125, 635
A.2d 762 (1993).

"A *Doyle* violation may, in a particular case, be so
insignificant that it is clear beyond a reasonable doubt
that the jury would have returned a guilty verdict with-
out the impermissible question or comment upon a
defendant's silence following a *Miranda* warning.
Under such circumstances, the state's use of a defend-
ant's postarrest silence does not constitute reversible
error." *State* v. *Silano,* 204 Conn. 769, 781, 529 A.2d
1283 (1987); *State* v. *Canty,* supra, 223 Conn. 711; *State*
v. *Hull,* supra, 210 Conn. 492; see also *Delaware* v. *Van
Arsdall,* 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed.
2d 674 (1986). "The [error] has similarly been

[found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the jugular of the defendant's story." (Internal quotation marks omitted.) *State* v. *Silano,* supra, 781; *United States* v. *Davis,* 546 F.2d 583, 594 (5th Cir.), cert. denied, 431 U.S. 906, 97 S. Ct. 1701, 52 L. Ed. 2d 391 (1977); *State* v. *Hull,* supra, 492; *State* v. *Pellegrino,* 194 Conn. 279, 292, 480 A.2d 537 (1984); *State* v. *Zeko,* 177 Conn. 545, 555, 418 A.2d 917 (1979). " 'The cases wherein the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt.' " *State* v. *Canty,* supra, 714; *State* v. *Zeko,* supra, 557.

Our review of the record convinces us that the admission of the detectives' testimony concerning the defendant's invocation of his rights was harmless beyond a reasonable doubt. The evidence was introduced in the context of the investigative efforts made by the police in connection with the sexual assault. The reference to the defendant's invocation of his constitutional rights was marginal in the context of the entire trial. The challenged testimony was a minor portion of the testimony of two witnesses occurring in the context of a fourteen day trial. The prosecutor, moreover, in closing argument, made no comment concerning the defendant's invocation of his rights and did not otherwise highlight the evidence to the jury.

Furthermore, other evidence introduced by the state persuasively established the guilt of the defendant beyond a reasonable doubt. That evidence included the victim's testimony, in which she consistently maintained, in the face of extensive cross-examination, that she had been sexually assaulted by the defendant. This

testimony was corroborated by significant independent evidence. The corroboration included constancy of accusation testimony from Murray, Anderson, three police officers, a hospital social worker, and Williams, the victim's treating physician. The victim's testimony that she and the defendant had traveled together in the defendant's sister's automobile was corroborated by testimony from Murray and Anderson. The description of the automobile provided by the victim to the police corresponded with that of the automobile discovered by the police. The victim's testimony that the defendant had a certain distinctive tattoo on his chest was corroborated by photographs of the defendant.

Additionally, the emotional trauma the victim displayed in the hours and days following the assault was corroborated by testimony from Anderson, Williams and three police officers. Specifically, Anderson testified that the victim had been distraught after she had returned from the journey with the defendant. Anderson testified further that, for days thereafter, during which time she stayed with the victim in Murray's apartment, the victim had been regularly crying, screaming in her sleep, and had recoiled from the touch of others. Further, Miranda and Milewski testified that the defendant had appeared to be in pain when she was transported to Yale-New Haven Hospital following the attack. These officers also testified that, when they had driven the victim around in the days following the attack, in an effort to locate the site of the attack, she had been sobbing. Milewski testified further that the victim was in a "hunched-over position with her hands in front of her" while they drove around looking for the site.

The physical condition of the victim immediately following the assault was corroborated by the testimony of Murray, Anderson, Milewski and Miranda. Moreover, Williams testified that the victim had fainted at Yale-

New Haven Hospital following the attack. Williams also testified that the physical condition of the victim had been consistent with sexual assault and that the victim exhibited bruises that, in her opinion, had been recently inflicted. Williams testified that nonmotile sperm had been discovered in the victim's vagina and that such nonmotile sperm could be present in the vagina for approximately twenty-seven hours after intercourse before disintegrating.

In addition, the state introduced evidence that: (1) there was a seminal stain found in the crotch area of the victim's underpants that did not display evidence of the blood type of the source of the semen; (2) nonsecreting individuals will not display their blood type in bodily fluids other than blood; and (3) the defendant is a nonsecretor, and therefore could have been the source of the seminal stain.[14] Although Williams' testimony that the victim's condition was consistent with a sexual assault was challenged by Thomas Hanson, an expert for the defense, Hanson admitted on cross-examination that (1) he had never examined the victim and that his opinion was based on photographs taken of her, and (2) although the victim did not display any vaginal trauma, one half of the victims of sexual assault whom he had personally examined display no such trauma.

There was also other significant evidence of the defendant's culpability. That evidence included the

[14] Daniel Tramontozzi, an expert working in the Connecticut state police forensic science laboratory, who examined the seminal stain, testified that approximately 20 percent of secreting individuals will not display evidence of blood type in particular samples of bodily fluids. The seminal stain in question, therefore, could have been produced by a secreting individual. Additionally, the stain could have been produced by a nonsecreting individual, such as the defendant, because a nonsecretor will never produce evidence of blood type in a seminal sample. This physical evidence, therefore, was consistent with, although not conclusive of, a finding that the defendant had sexually assaulted the victim.

defendant's admission to his sister, while they were discussing the sexual assault on the victim, that he had "fucked up" on the night of the assault, and that he had hit the victim. There was testimony by Murray that the defendant had repeatedly expressed his desire "to get laid" on the evening of the attack. Specifically, Murray testified that the defendant had referred to having sexual intercourse every time the subject of women came up or when Murray spoke to a woman during the night of the attack. Murray also testified to the fact that he and the defendant had made repeated efforts to find women on the night of the attack.

There was also significant evidence of consciousness of guilt arising from the defendant's false statements to the police. The defendant had stated to the police that he did not know the victim. The defendant's sister testified, however, that the defendant had indicated to her that he knew the victim, and had identified her by name. The fact that the defendant did know the victim was also established by the testimony of Murray and Anderson, by the photographic corroboration of the victim's testimony regarding the defendant's tattoo, and by the photographic corroboration of the victim's testimony describing the defendant's sister's automobile. Furthermore, the testimony of Murray and Anderson contradicted the defendant's statement to the police that he had spent the bulk of the evening at Monahan's bar, and the defendant introduced no evidence to support that purportedly exculpatory statement.

The defendant presented no evidence supporting any specific defense, other than the general defense implicit in putting the state to its burden to establish guilt beyond a reasonable doubt.[15] His entire trial strategy,

---

[15] The dissent insists that "at trial the defendant never attempted to controvert, through cross-examination of witnesses, presentation of evidence

as is made clear by the transcript of the evidence and of his closing argument, was to cast doubt on the credibility of the victim. In his closing argument, the defendant's attorney attempted to persuade the jury that it should reject the victim's credibility on the hypothesis that, after coming home to Murray in the early morning, she accused the defendant in order to divert the wrath of Murray, her boyfriend. There were, however, difficulties with this argument.

This was certainly an argument that the defense attorney was entitled to make in order to attempt to raise a reasonable doubt about the defendant's guilt, because there was evidence that Murray had previously hit the victim on several occasions. There was, however, little or no evidence to support the defendant's theory of defense that the victim had fabricated a story of a sexual assault by the defendant because she feared further violence at Murray's hands for having returned so late. This theory might have had some plausibility

or in summation, the fact that the defendant had driven with the complainant in the vehicle." We read the record differently. The defendant's cross-examination of the victim, which was aimed at attacking her credibility, did not distinguish between her credibility regarding whether they were in the automobile together and whether the sexual assault had occurred. Moreover, at no time, either during cross-examination or final argument, did the defendant suggest to the jury that the victim was telling the truth about having left with the defendant for the club, but had lied about the sexual assault. Indeed, when discussing, in final argument, the victim's testimony regarding the trip to the club, the defendant positively referred to the fact that "she," not they, left the apartment, and that "she," not they, "would be back in about ten minutes." In sum, the principal thrust of the defendant's final argument, as indicative of his theory of defense, was, not that the defendant and the victim had been out together for five hours, but that the entire incident simply had not occurred, and that "[w]hat we have is a story that was made up because [the victim] was coming home late and didn't want to be beaten [by Murray]." Therefore, the corroboration of the victim's testimony regarding the fact that (1) she, Murray, Anderson and the defendant had been drinking together, and (2) she and the defendant had been in the automobile together, is significant, because it independently supports her testimony and underscores the falsity of the defendant's exculpatory statements to the police when he was arrested.

had the defense been that the victim and the defendant had engaged in consensual intercourse. It was, however, wholly conjectural, as the state responded in rebuttal, in light of the defendant's statement to the police that he did not even know the victim and had spent the entire evening at Monahan's bar. Moreover, all of the evidence considered by the jury was to the contrary. Additionally, the jury knew that the victim had returned to Connecticut from California, where she had moved after the attack, in order to testify against the defendant. The jury could have reasonably inferred that, had the victim made up her charges solely to appease Murray, she would have been unwilling to return to Connecticut from California, long after the alleged fabrication, in order to perpetuate it.

"Due process seeks to assure a defendant a fair trial, not a perfect one." *State* v. *Kurvin,* 186 Conn. 555, 565, 442 A.2d 1327 (1982); *State* v. *Canty,* supra, 223 Conn. 722. Here, the Appellate Court concluded that the *Doyle* violation was so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the admission of the detectives' testimony. Given the significant amount of evidence of the defendant's guilt, coupled with the relatively innocuous nature of the *Doyle* violation, we agree with the Appellate Court's conclusion.

The judgment of the Appellate Court is affirmed.

In this opinion PETERS, C. J., and CALLAHAN and NORCOTT, Js., concurred.

BERDON, J., dissenting. I would hold that the state failed to meet its burden of proving that the evidence admitted in violation of *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), was harmless beyond a reasonable doubt.

In *Doyle,* the United States Supreme Court held that it is fundamentally unfair, and therefore in violation

of due process, for the state to use a defendant's silence after receiving *Miranda* warnings to impeach the defendant. The *Doyle* court "based its holding in two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important, it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."[1] (Internal quotation marks omitted.) *State* v. *Jones,* 215 Conn. 173, 183–84, 575 A.2d 216 (1990).

Subsequent decisions have made clear that the *Doyle* principle is violated when the state uses post-*Miranda* silence as affirmative proof of a defendant's guilt, as well as when the state uses the evidence for impeachment purposes. *United States* v. *Szymaniak,* 934 F.2d 434, 439 (2d Cir. 1991); *State* v. *Hull,* 210 Conn. 481, 489, 556 A.2d 154 (1989). " 'With respect to post-*Miranda* warnings "silence," . . . silence does not

---

[1] As Justice Shea pointed out in *State* v. *Morrill,* 197 Conn. 507, 498 A.2d 76 (1985), the *Doyle* principle has its roots firmly embedded in the common law of Connecticut. "Where . . . the accused is in custody, our law accords him the right to reply to question or statement, or to remain silent. His silence under such circumstances cannot be laid in evidence against him. *State* v. *Ferrone,* [97 Conn. 258, 266, 116 A. 336 (1922)]; 3 Wharton, [Criminal Evidence (13th Ed.)] § 703." (Internal quotation marks omitted.) *State* v. *Morrill,* supra, 535. Indeed, in *State* v. *Leecan,* 198 Conn. 517, 526, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986), this court held that postarrest silence, even in the absence of *Miranda* warnings, is inadmissible as a matter of a nonconstitutional state common law rule of evidence. The court noted that such silence had been held to not offend the due process clause of the federal constitution. Id., 524–25, citing *Fletcher* v. *Weir,* 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982).

mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted.' [*Wainwright* v. *Greenfield,* 474 U.S. 284, 295, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986)]." *State* v. *Hull,* supra, 489.

In view of these standards, it is clear that the Appellate Court correctly determined that the admission of the defendant's statements regarding his right to remain silent and his right to counsel violated the defendant's right to due process. Contrary to the majority's gratuitous suggestion, the admission of the defendant's statements was not necessary to establish the context of the investigative efforts made by the police. Although the state had a legitimate interest in exposing the defendant's inculpating statements at the time of arrest; *Anderson* v. *Charles,* 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980); this interest "could have been served by carefully framed questions that avoided any mention of the defendant's exercise of his constitutional rights to remain silent and to consult counsel." *Wainwright* v. *Greenfield,* supra, 474 U.S. 295.

The majority holds the admission of the defendant's statements invoking his constitutional rights harmless. Because the majority does not make clear the context in which the state elicited the *Doyle* violations before the jury, I will briefly restate the evidence. Wallingford police detectives Theodore Milewski and Patrick Shanley both testified regarding their interrogation and subsequent arrest of the defendant for kidnapping and sexual assault. On the ninth day of trial, Milewski testified that the two detectives confronted the defendant at the West Haven police department. The jury was never informed that the defendant was being held there on his sister's complaint that he had used her car without permission in violation of General Statutes § 53a-119b. Milewski testified that he and Shanley told

the defendant that they were investigating a sexual assault that had occurred earlier that day, and that he was the accused. The defendant asked who they were. Milewski explained that they were Wallingford police officers, and the defendant stated: "It didn't happen." Milewski read the defendant his *Miranda* rights, and asked the defendant if he understood them. The defendant responded in the affirmative. Next, Milewski asked the defendant if he wished to waive his rights or give up his rights. The defendant's "reaction was, no, that he would not give up anything."

Milewski further testified that the defendant then asked Shanley, "When did this happen?" Shanley told the defendant that it had occurred early that morning, and the defendant stated that he had been at a bar called Monahan's Shamrock Cafe until closing, and named several individuals who would support his alibi. The defendant said that he could not remember what he did after the bar closed because he had been drunk. Shanley then requested that the defendant consent to give a sample of his pubic hair, and the defendant refused. Milewski testified: "Then Shanley asked him if he knew a girl by the name of [the complainant]. At that point he said, 'no. I don't think I want to give up anything. I want to talk to a lawyer.' " Milewski testified that he next made a telephone call to the Wallingford police department, and learned that the complainant had signed a sworn statement. Finally, Milewski testified: "We then placed Mr. Daugaard under arrest. We arrested him at this time for sexual assault in the first degree and unlawful restraint, and from that point transported him back to Wallingford police department headquarters."

On the eleventh day of trial, Shanley repeated all of the testimony that Milewski had provided. In particular, he testified that, when advised of his rights, the defendant "stated words to the effect that he was not

giving up anything . . . ." Shanley clarified that he had requested that the defendant "consent to a search of his personal body as far as head hair and a sample of his pubic hair, and a saliva sample, a blood sample. He declined that, and stated that he would not submit to that." In addition, Shanley testified that "I asked him if knew a girl by the name of [the complainant]. He said no. At that point he didn't want to answer any more. He didn't want to [talk] any more without speaking to an attorney. We terminated our conversation at that point." Shanley further testified that they subsequently obtained a search warrant for the defendant's hair and blood samples.

"When error is of constitutional dimension, the state has the burden of proving it harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 24–26, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967)." *State* v. *Jones,* supra, 215 Conn. 184. The state must demonstrate that there is no reasonable possibility that the improperly admitted evidence contributed to the conviction. Id. "The harmlessness of an error depends upon its impact on the trier and the result, not upon whether the particular evidence involved was legally essential to support the finding. . . . *State* v. *Moscone,* 171 Conn. 500, 508–509, 370 A.2d 1030 (1976) (*Miranda* violation not harmless despite abundance of properly admitted evidence tending to prove guilt)." (Citations omitted; internal quotation marks omitted.) *State* v. *Hull,* supra, 210 Conn. 492. To ascertain harmlessness, the *Doyle* violations are examined in the context of the record as a whole. *Harrington* v. *California,* 395 U.S. 250, 254, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969).

In the present case, the *Doyle* violations were elicited on direct examination, but, as the majority notes, the state did not direct attention to them at summation.

"When the prosecutor does not directly tie the fact of [the] defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible *or* the indicia of guilt not overwhelming." (Emphasis added.) *Chapman* v. *United States,* 547 F.2d 1240, 1249 (5th Cir.), cert. denied, 431 U.S. 908, 97 S. Ct. 1705, 52 L. Ed. 2d 393 (1977); *State* v. *Canty,* 223 Conn. 703, 728 n.2, 613 A.2d 1287 (1992) (*Berdon, J.,* dissenting); see *State* v. *Silano,* 204 Conn. 769, 781, 529 A.2d 1283 (1987) (*Doyle* error may be harmless if "the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming" [internal quotation marks omitted]).

In my opinion, the *Doyle* violations were clearly harmful in the present case. First of all, the defendant's exculpatory story was not implausible. The majority would lead one to believe that unless the defendant testified or there was other direct evidence of an exculpatory story, the state has satisfied the first test for harmlessness. This is simply not the case, and certainly does not provide a justification for the majority to reject the defendant's theory of defense. Through cross-examination, presentation of evidence, and argument the defendant developed the defense that the complainant had fabricated the sexual assault to appease her physically abusive boyfriend, Murray, after staying out all night with the defendant. The complainant admitted on cross-examination by the defendant that Murray had assaulted her on more than one occasion before the incident, hitting her in the face and on other parts of her body. She had twice called the police as a result of these assaults, and there were times that she had been physically abused and had not called the

police.[2] In particular, he would strike her when he had been drinking. Murray testified that he had been drinking the night of the alleged sexual assault—six and one-half beers, and a shot of vodka before the complainant left with the defendant—although this only affected him "slightly." The defendant did not dispute that the defendant and the complainant drank at Murray's apartment, and then left together in the defendant's automobile.[3] The complainant arrived back at Murray's

[2] The defendant stated in his summation to the jury: "You saw [Murray] testify. He kind of lost his cool a couple of times the first day. Then, he was pretty much under control after that in front of you."

[3] Despite the claim in footnote 15 of the majority opinion to the contrary, it simply was never disputed that the defendant and the complainant drank together at Murray's apartment and then *drove off together* for the stated purpose of getting liquor. For example, on cross-examination of Murray, the defendant asked a series of questions, the purpose of which was to establish that the complainant initiated the trip in the defendant's car after the defendant had flirted with her.

"Q. I think you testified that during the time that you were in the house drinking, [the defendant] was coming on to [the complainant], is that right?
"A. Correct.
"Q. You actually saw this?
"A. Yes.
"Q. So, we are all out of booze at about one o'clock in the morning, is that right?
"A. Yes.
"Q. [The complainant] suggests an after-hours place?
"A. Yes.
"Q. She knew where the place was?
"A. Yes. . . .
"Q. Kristen had some money?
"A. Yes.
"Q. She gave the money to [the defendant]?
"A. To [the defendant].
"Q. [The complainant] was going to get the booze with [the defendant]?
"A. Yes.
"Q. [The defendant] is the only one who had a car.
"A. Yes.
"Q. It is now one o'clock in the morning, and she is going to get some more booze for you guys to drink that night?
"A. Yes.
"Q. So the party could continue?

house so late that it was getting light outside. This was approximately five hours after she left. When she arrived at Murray's house she perceived that Murray was angry at the defendant. At that point, she did not tell Murray what had happened. When she finally told Murray what had happened, one-half hour after she had arrived, he stopped being angry and became supportive of her. The defendant elicited all of this evidence on cross-examination of the state's witnesses. Accordingly, I disagree with the majority that there was "little or no" evidence to support the defendant's theory of defense, which was that the complainant fabricated the story of a forcible sexual assault in order to appease Murray, because he was angry and had battered her in the past.

"A. Yes.
"Q. You expected them to be gone for about ten minutes?
"A. Yes.
"Q. You and Kristen stayed in the apartment?
"A. Yes.
"Q. You waited for them to come back?
"A. Yes.
"Q. They didn't come back in ten minutes, did they?
"Q. No. . . .
"Q. She came back around five hours later?
"A. Yes."

The defendant conducted a similar cross-examination of Kristen Anderson, obtaining from her testimony that the complainant, the defendant, Murray and she drank together; they ran out of liquor; the complainant stated that she knew a place where they could get liquor, and the defendant left with the complainant in the defendant's automobile. At no point in the cross-examination of any witness did the defendant attempt to dispute that he and the complainant drank together at Murray's apartment and then left in the defendant's car together.

Furthermore, despite the use of the pronoun "she" referred to by the majority, a fair reading of the defendant's summation reveals that the defendant never disputed these facts in the summation, either. For the majority to latch on to the pronoun "she" in order to transform the defendant's summation into a defense that the defendant did not leave the apartment with the complainant is outrageous in light of the uncontroverted testimony of the complainant, Murray and Anderson that the defendant and the complainant left the apartment together in order to obtain liquor from an after-hours establishment.

The defendant's theory of defense and the evidence elicited in support thereof alone should result in a determination that the state failed to sustain its burden of proving the *Doyle* errors harmless beyond a reasonable doubt. Instead, the majority dismisses the defendant's defense because it was inconsistent with the defendant's statement to police, while being interrogated in the West Haven lockup and after having been accused of rape, that he did not know the complainant. This is misleading and unfair to the defendant, because at trial the defendant never attempted to controvert, through cross-examination of witnesses, presentation of evidence or in summation, the fact that the defendant had driven with the complainant in the vehicle. It is the *defense presented at trial* that we must focus on in order to determine whether the defense "is not totally implausible."

Second, the evidence of guilt in the present case was far from overwhelming. The conviction of the defendant was predicated on evidence that was to a large extent dependent on the complainant's credibility, namely, her in-court testimony, her out-of-court hearsay statements admitted through constancy of accusation witnesses, and her physical reactions that served to display her emotions in front of others. In addition, there was consciousness of guilt evidence and inconclusive forensic testimony. This evidence, while sufficient to convict the defendant, did not reach the level of overwhelming evidence necessary to make the *Doyle* violations harmless beyond a reasonable doubt.

Nevertheless, the majority opinion, to support its determination of harmless error, uses an inappropriate standard. In doing so, the opinion continues the "remarkable dilution" of the standards for determining harmless error I noted in my dissent in *State* v. *Canty,* supra, 223 Conn. 729, by relying on the fact that there was "significant" evidence of the defendant's

guilt, and that the state's evidence "persuasively established the guilt of the defendant beyond a reasonable doubt." As I noted in *Canty*, the standard applied by this court in the past; see id., 729 (lists Connecticut cases); and, more importantly, by the federal courts; *United States* v. *Hasting*, 461 U.S. 499, 512, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983); *United States* v. *Dixon*, 593 F.2d 626, 629 (5th Cir.), cert. denied, 444 U.S. 861, 100 S. Ct. 126, 62 L. Ed. 2d 82 (1979); is that constitutional error is harmless only if the state has presented "overwhelming evidence of guilt"—not significant evidence of guilt, nor evidence persuasively establishing guilt beyond a reasonable doubt. If in the first instance the state failed to reach the level of proof beyond a reasonable doubt, that would put the entire case to rest in favor of the defendant without any need for this court to analyze the effect of the *Doyle* violations on the verdict.

The state did not present overwhelming evidence of guilt in this case. The majority opinion relies on the following evidence. First, it relies on the complainant's own testimony and her consistent out-of-court statements. In this regard, I find it astonishing that the majority merely mentions in a footnote that the jury acquitted the defendant of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), and its lesser included offenses of kidnapping in the second degree in violation of General Statutes § 53a-94, and unlawful restraint in the second degree in violation of General Statutes § 53a-96.[4] Because of the jury's

---

[4] General Statutes § 53a-92 provides in relevant part: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

General Statutes § 53a-94 (a) provides: "A person is guilty of kidnapping in the second degree when he abducts another person."

General Statutes § 53a-96 (a) provides: "A person is guilty of unlawful restraint in the second degree when he restrains another person."

acquittal of the defendant on these charges, the majority's reliance on certain "facts," supported solely by the complainant's uncorroborated testimony, is unwarranted. Accordingly, the following testimony of the complainant should not be considered to bolster the state's case: the defendant forcibly took control of his sister's car; ignored the complainant's directions; told the complainant that she "wasn't going anywhere"; struck her in the face; grabbed her neck and forced her head under the dashboard repeatedly; warned her to keep her head down and not look where they were going; continually threatened her with physical harm; and told her that the only way she could escape was to jump out of a vehicle moving in excess of sixty miles per hour. If the jury found that testimony to be credible, it would not have acquitted the defendant of kidnapping and unlawful restraint.[5]

Nevertheless, it should be clear that the uncorroborated testimony of a complainant cannot constitute overwhelming evidence of guilt. Accordingly, the majority relies on certain evidence that they claim corroborates the complainant's story. In my opinion, none of the nonforensic evidence relied on by the majority—the defendant's false statements while being interrogated by the police, Murray's testimony that the defendant wanted to "get laid," the testimony of the defendant's sister that the defendant admitted *hitting* the complainant,[6] and the testimony that the com-

[5] Furthermore, the defendant presented the testimony of the complainant's landlord, who testified that in his opinion the complainant was not a truthful person. The state presented no witnesses to rebut this character evidence.

[6] The defendant's sister, Sharon Phaneuf, also testified that in the conversation in which the defendant had admitted hitting the complainant, she had told him that he "fucked up," and he had responded, "yes, [I] did." The effect of this evidence on the jury must be viewed in the context of Phanuef's subsequent testimony that, with her question "you fucked up," she was referring in part to an unrelated personal dispute between her brother and she.

plainant exhibited emotional trauma after the alleged assault—serve to so corroborate the complainant's testimony as to constitute overwhelming evidence of guilt.

I am mystified by the majority's emphasis on the complainant's accurate description of the vehicle that she and the defendant traveled in to the police, and other facts that merely serve to support the inference that the complainant was with the defendant. As previously noted, the defendant never attempted to controvert at trial, through cross-examination of witnesses or in summation, the fact that the defendant had driven with the complainant in the vehicle. Furthermore, the majority opinion is misleading to the extent that it relies on the fact, in support of a conviction for sexual assault, that the complainant accurately described a "distinctive tattoo" on the defendant's chest. The uncontroverted testimony at trial was that when Murray, Anderson, the defendant and the complainant were drinking together in Murray's apartment, the defendant opened his shirt to show off his tattoo. I am deeply troubled that the majority fails to indicate that the uncontroverted basis for the complainant's knowledge of the defendant's tattoo was not a sexual encounter.

As for the forensic evidence, although the majority repeatedly indicates that the physical condition of the complainant following the assault was "consistent" with sexual assault, the forensic evidence was inconclusive and in many respects supported the defendant. A police search of the defendant's sister's car yielded no traces of semen or blood, and hair samples from the car had no evidentiary value, as they did not match the defendant's hair, and were never matched with the complainant's hair. No hair samples taken from the rape kit matched the defendant's hair. State police forensic laboratory analysis of the bodily fluids of the defendant and seminal fluid found within the complainant could only identify the defendant as within a

group of approximately 20 percent of the population that could have contributed the seminal fluid.

The state called Carla Williams, a resident physician specalizing in gynecology at the Yale-New Haven Hospital, who treated and physically examined the complainant approximately five hours after the incident. The only evidence that could remotely support a recent forcible sexual assault revealed by her examination was the finding that the complainant's uterus and one of her ovaries were "slightly tender." Williams testified, however, that such tenderness is not uncommon and could have many causes unrelated to sexual conduct. She also testified that the complainant had bruises and that she believed them to be recent.

Thomas Hanson, a physician called by the defendant *who was Williams' teaching and supervising physician,* testified that the medical reports prepared by Williams did not corroborate the complainant's allegations. He pointed out the following evidence: Williams had found no evidence of internal or external trauma to the complainant's genitalia, which he would have expected to find based on the her description of the assault; Williams' finding of a slightly tender uterus could have many causes, most not directly related to sexual activity; and photographs of her bruises taken five hours after the incident showed a brownish-yellow color, indicating in Hanson's opinion that the bruises had been inflicted two to three days before the incident. Indeed, Williams, Hanson's student, admitted that she did not have the expertise or experience to determine, based on the color of the bruises, whether they were recent, other than her opinion that they were less than twenty-four to forty-eight hours old.[7] I find it interesting that

---

[7] Williams testified with regard to the progression of colors typically found in bruises: "I never personally studied that. I can't tell you the progression of a bruise. I can only say what I have seen in the past. Again, I am in obstetrics and gynecology. I am not an emergency room doctor. I am not qualified to give the progression of bruises . . . ."

the majority places reliance on the bruises of the complainant, but fails to disclose that she admitted, as previously indicated, that Murray, her boyfriend, or very recently ex-boyfriend, had physically battered her in the past.

The final piece of "evidence" that the majority relies on in finding harmless error is its claim that since the complainant traveled a long distance and voluntarily testified, she must have been telling the truth. This is perhaps the ultimate "bootstrap" argument—the complainant testified, therefore, she must have been telling the truth!

The majority also claims that the *Doyle* violations in the present case were "marginal in the context of the entire trial." The *Doyle* violations in this case were not isolated and had great potential to prejudice the defendant because of the context in which they were raised. Two different police detectives testified on different days late in the trial that the defendant had asserted both his right to remain silent, and his right to consult with an attorney. The statements were admitted in conjunction with testimony regarding the defendant's refusal to consent to a warrantless search of his body and production of blood, saliva and hair samples, testimonial evidence that itself was unquestionably prejudicial. More importantly, the testimony indicated that the defendant claimed his constitutional rights immediately prior to and subsequent to his false statements that he had an alibi and did not know the complainant. Furthermore, the detectives both testified that, shortly after the defendant invoked his constitutional rights, they arrested him for sexual assault in the first degree.

Therefore, the jury was not presented with an abstract assertion of constitutional rights by the defendant, but an assertion of rights by a defendant contemporaneous to his refusal to allow a search of his body

for evidence of the crime, in the same conversation in which the defendant made two false statements, and immediately prior to the decision to arrest. Indeed, the majority places emphasis on the defendant's false statements, just as the prosecutor did in closing argument, stating that they represented "significant evidence of consciousness of guilt" and render his sole theory of defense "wholly conjectural."

I am unable to accept that it is harmless for the jury to learn that the defendant claimed his constitutional rights to silence and assistance of counsel immediately before and after uttering inculpatory falsehoods that, according to the majority, were significant evidence that indicate his consciousness of guilt. It seems far more likely to me that the jury would have relied on the *entire conversation* as indicative of consciousness of guilt, including the defendant's invocations of constitutional rights. Under these circumstances, there is at least a reasonable possibility that the jury determined that the ordinarily "insolubly ambiguous" evidence of silence pointed inextricably to the defendant's guilt.

Furthermore, the *Doyle* violations in the present case were particularly harmful because the defendant chose to exercise his constitutional right to remain silent at trial, and did not testify. The admission of the *Doyle* statements could only intensify jury speculation as to the reason why the defendant chose to exercise his constitutional rights both at the time of arrest and at the time of trial.

This court has repeatedly stated that "comment upon the silence of the accused as a prosecutorial technique is often a crooked knife, and one likely to turn in the prosecutor's hand. The infusion of harmlessness into error must be the exception, applicable in circumstances few and discrete, and to be sparingly employed. *State* v. *Zeko,* 177 Conn. 545, 558, 418 A.2d 917 (1979)."

(Internal quotation marks omitted.) *State* v. *Morrill,* supra, 197 Conn. 539. Unfortunately, the recent jurisprudence of this court; see *State* v. *Canty,* supra, 223 Conn. 703; is strong evidence that, today, the infusion of harmlessness into error is the rule, not the exception. Indeed, the manner in which the *Doyle* issue was raised below truly highlights the injustice done by the majority opinion in the present case.

The defendant and the state clashed over the admission of the evidence of the defendant's exercise of his constitutional rights on three separate occasions. First, the defendant, the state, and the trial court were placed on notice at the suppression hearing that Milewski and Shanley would testify as to the defendant's invocations of his constitutional rights, and the defendant objected *at that time,* well before trial, to this testimony. The trial court expressly noted that the issue raised was independent of the issues argued in the suppression hearing, and instructed the defendant to file a motion in limine challenging the evidence. The defendant filed the motion, but when it was argued one week later, the state represented to the trial court that the issue *had already been argued and decided* at the suppression hearing. The trial court, *Flanagan, J.,* denied the motion, stating that it agreed with the state that it had already decided the issue. The defendant took exception and, prior to the testimony of Milewski and Shanley before the jury, the defendant filed a second motion in limine on the same grounds. Again, the state represented that the issue already had been litigated, but the trial court, *Ripley, J.,* expressed some concern: "With respect to the court's ruling did that include the totality of the colloquy between the defendant and the detective including these statements?" The state responded: "He made his ruling based on . . . exhaustive argument, nitpicking and discussions and case analogies, et cetera." The trial court then denied the motion

"on the basis that it would be consistent with Judge Flanagan's ruling." Therefore, the *Doyle* violations in this case were not inadvertently introduced into evidence through nonresponsive testimony, but were solicited by the state over the defendant's repeated objection.

It may well be that the manner in which the state and the trial court allowed the *Doyle* violations to occur is somewhat irrelevant to the *harmlessness* inquiry because it is outside the jury's knowledge.[8] Yet, this court is not merely an instrumentality of the federal system, designated to mechanically apply rules of federal law. To the contrary, this court has the authority and duty to utilize its supervisory authority to maintain the integrity of Connecticut's system of justice. "[A] reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial. Instead, an appellate court should be concerned with the integrity of the process leading to the conviction. Consequently, the court should . . . determine whether declaring the error harmless would encourage the State to repeat it with impunity." *Harris* v. *State,* 790 S.W.2d 568, 587 (Tex. App. 1989). On the basis of the state's conduct in this case, I would reverse the defendant's conviction even if it did prove harmlessness beyond a reasonable doubt.

---

[8] Of course, the manner in which an objection is raised and overruled is not wholly irrelevant to harmlessness. First, the existence of a curative instruction can lessen the harmfulness of error. See *Bass* v. *Nix,* 909 F.2d 297, 305 (8th Cir. 1990); *State* v. *Negron,* 221 Conn. 315, 331, 603 A.2d 1138 (1992) (because *Doyle* violation "was solitary, was not pursued and was the subject of a curative instruction, we conclude that the inadvertent admission into evidence of that single answer . . . was harmless"). Because the trial court in the present case held that the testimony was admissible, there was, of course, no curative instruction.

Second, a failure to object has been held relevant to the harmfulness inquiry. "[T]rial counsel's failure to object to the question . . . indicates that he did not consider this portion of the [testimony] to have prejudiced the defendant." *State* v. *Canty,* supra, 223 Conn. 712.

Today's decision undermines the requirement that the state prove, beyond a reasonable doubt, that an error of constitutional magnitude is harmless. As long as the defendant exercises his or her constitutional right not to testify, and there is sufficient evidence to support a finding of guilt, there will be no appellate consequences to any but the most egregious constitutional violations. The only remaining barriers to the utilization of such evidence will be the vigilance of trial courts and the prosecutor's own conscience.

I respectfully dissent.[9]

[9] Because I would order a new trial, I would not reach the *Brady* issue resolved in the majority opinion. *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).