STATE OF CONNECTICUT *v.* DANIEL SANTIAGO
(AC 20812)

Lavery, C. J., and Dranginis and Healey, Js.

Argued April 25—officially released October 29, 2002

*Darcy McGraw*, special public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Victor Carlucci, Jr.*, assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Daniel Santiago, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55 (a) (1) and 53a-55a (a),[1] and assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[2] On appeal, the defendant claims that the trial court (1) improperly permitted the prosecutor to engage in misconduct during cross-examination of the defendant and in closing argument, which deprived the defendant of a fair trial, (2) incorrectly found certain essential facts in denying his motion to suppress his written statement to the police and, therefore, a plenary review of the denial of that motion is warranted, (3) improperly permitted the

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses . . . a pistol, revolver . . . or other firearm. . . ."

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

state to use evidence of his post-*Miranda*[3] silence against him in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), (4) improperly admitted evidence regarding his nickname, "Danger," and testimony that he denied using that nickname, and (5) improperly instructed the jury regarding intent with respect to the charge of manslaughter in the first degree with a firearm.[4]

We reverse the judgment of the trial court and order a new trial because we agree that the prosecutor engaged in misconduct that deprived the defendant of a fair trial. We also will address the defendant's remaining claims, except his final claim, because they are likely to arise in the new trial.

The jury reasonably could have found the following facts. On November 26, 1997, the victim's brother, Craig Pitts, saw the victim, Barrett Applewhite, and the defendant having "a few words" outside of an apartment building at 39 Wadsworth Street, Hartford. About one week earlier, Applewhite had "fronted" the defendant cocaine to sell, and the defendant had agreed to pay Applewhite $500 after he sold the drugs. Although Pitts did not know what was said, the situation did not appear to him to be very serious, and Applewhite and the defendant soon went their separate ways. Afterward, Applewhite told Pitts that the defendant was "crazy" and that he did not know what was wrong with him, but he did not give any details.

That evening, Applewhite, Michael Ibscher and Stephen Gomes drove to 39 Wadsworth Street to visit Jessica Gonzalez and Maureen Jackson. After a while, they decided to take Applewhite and a two year old child who

---

[3] See *Miranda* v. *United States*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] We have recited the claims in the order in which we will address them rather than in the order in which they are presented in the defendant's brief.

was visiting Jackson to the child's home on Franklin Avenue, to drop off Gonzalez' friend, Rocio Castro, at her house and then to drive to Massachusetts to purchase liquor.[5] They entered a Lincoln Navigator sport utility vehicle that was parked in front of the building. Ibscher drove, Applewhite sat in the front passenger seat and Gomes, Castro, Gonzalez and Gonzalez' cousin, Jennifer Colon, sat in the backseat. As they drove away from the building and proceeded along Wadsworth Street, Applewhite received a call on his cellular telephone informing him that they had forgotten to bring the two year old child with them. Ibscher thereupon backed up the vehicle all the way to the front of 39 Wadsworth Street and parked. Jackson brought the child downstairs to the vehicle and put her on Gomes' lap.

At about that same time, the defendant, wearing dark pants and a black hooded sweatshirt with the hood up, crossed Wadsworth Street and walked to the parked vehicle. He looked in the front passenger window directly at Applewhite and started "talking junk," saying, "What? What?" Applewhite responded, "What's your problem?" and asked why the defendant had approached the vehicle. Applewhite then said to the others, "Let me see what's wrong with that [expletive]." Applewhite opened the door and stepped out of the vehicle to the sidewalk. He told the defendant that he was acting as if they had backed up the vehicle because of him, but that was not the case. He also told the defendant that they had no problem with him. The defendant, still facing Applewhite, moved toward the rear of the vehicle, saying, "What? What?" Applewhite followed the defendant, reiterating that they had not backed up because of him and that he should leave.

---

[5] Apparently, at that time, it was too late in the evening to purchase liquor legally in Connecticut.

Ibscher, noticing that the defendant was "agitated," decided to join Applewhite to help prevent any problems. Ibscher exited the vehicle, walked to Applewhite and told him to relax, that it was a holiday and that they did not need any trouble. Neither he nor Applewhite were armed, and there were no weapons in the vehicle. Sensing that Applewhite would not advance on the defendant, but merely would discuss the matter with him, Ibscher moved a few feet behind Applewhite. The defendant, however, kept saying, "What? What?" and appeared to be agitated, upset and dazed.

At that time, Applewhite and the defendant were standing about eight to ten feet apart. Although neither Applewhite nor Ibscher moved toward the defendant, he suddenly pulled out a black automatic handgun[6] from his sweatshirt pocket and began shooting at Applewhite because he saw Applewhite reach "into his waist."[7] Applewhite immediately turned away from the defendant and started to run toward the building at 39 Wadsworth Street, but he was shot in the back.[8] Ibscher told the defendant that he was "crazy," and the defendant "swiveled" toward Ibscher and shot him, hitting him in the leg as he was running through an alley to the parking lot next to the building. In total, the defendant fired six

---

[6] It later was determined that the gun was a .38 caliber automatic Beretta pistol.

[7] At trial, the defendant testified that when he shot Applewhite, he was fearful for his life because sometime earlier, he had observed Applewhite shoot a person who was purchasing drugs from him in front of 39 Wadsworth Street. Hartford police Officer Robert Burgos testified that Applewhite was an "upper level" drug dealer with violent tendencies who sold drugs in the Wadsworth Street area.

[8] Applewhite's autopsy disclosed two gunshot wounds. One bullet entered the left side of his back just above the hip. That bullet passed through his spleen, left kidney and aorta before stopping near his heart on the right side of his vertebral column. The other bullet entered and exited the soft tissue in back of his knee joint. The bullets were the hollow point type, which are designed to expand inside the body and inflict added damage.

or seven shots in rapid succession. After the defendant's automatic gun clicked twice, the defendant turned and ran across the street and along a pathway between 54 and 60 Wadsworth Street toward a public housing project.

In the meantime, Gomes, concerned about the safety of the women and the child, got into the driver's seat of the vehicle and sped off. They dropped off Castro at her house, called the police and drove to Franklin Avenue to drop off the child. While on Franklin Avenue, the police stopped and searched the vehicle and questioned the remaining passengers.

The police officers who had arrived at the crime scene tried to gather information from the victims and witnesses concerning the shooting. At the scene, Ibscher identified the shooter as "Danger." By running that alias through a computer and by the process of elimination, the police were able to identify the defendant as a possible suspect. Thereafter, Ibscher, Gomes, Gonzalez and Castro all separately identified the defendant from a photographic array. On November 29, 1997, the police obtained a warrant for the defendant's arrest and sent "wanted" flyers to the news media.

On December 1, 1997, the defendant turned himself in to the Hartford police. He agreed to be interviewed and gave a statement to the police, admitting that he shot Applewhite and Ibscher but claiming that it was in self-defense. Thereafter, the defendant was arrested. After a jury trial, the defendant was convicted of manslaughter in the first degree with a firearm and assault in the first degree.[9] He was sentenced to a total effective term of sixty years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

[9] The jury found the defendant not guilty on a charge of murder in violation of General Statutes § 53a-54a (a).

I

The defendant first claims that the court improperly permitted the prosecutor to engage in misconduct during cross-examination of the defendant and in closing argument, which deprived the defendant of a fair trial. Specifically, he claims that the prosecutor improperly (1) compelled him to comment on the veracity of the state's witnesses during cross-examination and then highlighted that testimony in closing argument, (2) expressed his personal opinion during closing argument, and (3) appealed to the jury's passions, emotions and prejudices.

Although the defendant failed to preserve those claims properly at trial, he nevertheless maintains that they are reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[10] We will review the claims under *Golding* because the record is adequate to do so, and an allegation of prosecutorial misconduct in violation of a fundamental right is of constitutional magnitude. We conclude that the challenged comments caused the defendant substantial prejudice and deprived him of a fair trial.

[10] Pursuant to *State* v. *Golding*, supra, 213 Conn. 233, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. "In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances. . . . The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." (Citation omitted; internal quotation marks omitted.) *State* v. *Jordan*, 64 Conn. App. 143, 150, 781 A.2d 310 (2001).

"To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Citations omitted.) *State* v. *Alexander*, 254 Conn. 290, 303, 755 A.2d 868 (2000).

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . . Moreover, prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 700, 793 A.2d 226 (2002).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 262–63, 780 A.2d 53 (2001).

"As is evident upon review of these factors, it is not the prosecutor's conduct alone that guides our inquiry,

but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 701–702.

With those principles in mind, we address each of the defendant's claims of prosecutorial misconduct in turn to determine whether the particular conduct was improper before determining whether the impropriety, if any, deprived the defendant of a fair trial.

### A

The defendant first claims that during cross-examination, the prosecutor improperly compelled him to comment on the veracity of the state's witnesses, and then highlighted that testimony in rebuttal argument to the jury. We agree.

The following additional facts are relevant to our analysis. In his written statement to the police, the defendant admitted having shot Applewhite, but claimed that it was in self-defense. At trial, the defendant acknowledged that he had not been completely truthful in his statement and testified that there were facts in that statement that he did not provide. On cross-examination, the prosecutor asked the defendant if, in the statement, he had told the police that he knew there were other people in the vehicle at the time of the shooting.[11] The defendant answered: "I didn't say that. The officer wrote that." At that point, the following colloquy occurred:

"[Prosecutor]: The officer wrote that. You didn't say that [because] he put words in your mouth?

"[Defendant]: Yes.

"[Prosecutor]: Pardon.

"[Defendant]: Yes.

"[Prosecutor]: So, when you didn't agree with the officer, he put words in your mouth, is that correct?[12]

* * *

"[Prosecutor]: So, where you don't agree with the officer, he put words in your mouth?

"[Defendant]: At that time I was—I was not thinking right. He was just asking me questions, and I was just saying yes or no, yes or no.

"[Prosecutor]: You heard the officer's testimony?

---

[11] During direct examination, the defendant testified that he could not see anyone else in the vehicle. The written statement reads in relevant part: "They were some other people in the back but I didn't see them through the tinted windows."

[12] Defense counsel objected to that question, but the court overruled the objection.

"[Defendant]: Yes.

"[Prosecutor]: . . . that he didn't ask you yes or no questions?

"[Defendant]: That's all he—asked me questions about the incident. That's all he said. If I seen it, I didn't, and stuff like that."

Later, the prosecutor asked whether, on the evening of the shooting, the defendant had approached the vehicle. At trial, a number of the state's witnesses had testified that he approached their vehicle as it was parked in front of 39 Wadsworth Street. In response to the prosecutor's question, the defendant stated that he did not approach the vehicle. Thereafter, the following colloquy occurred:

"[Prosecutor]: Okay. You heard all the testimony?

"[Defendant]: Yes.

"[Prosecutor]: They said you approached?

"[Defendant]: Yes.

"[Prosecutor]: Okay. They were all lying?

"[Defendant]: Yes."

In rebuttal argument to the jury, the prosecutor underscored the defendant's testimony that the state's witnesses all lied during their testimony. The prosecutor stated: "And did Michael Ibscher lie? Did all these witnesses get together and lie? The police lied? That's what they want us to believe."

Initially, we note that the defendant relies on *State v. Singh*, supra, 259 Conn. 702–12, as authority for his prosecutorial misconduct claim.[13] The state contends

---

[13] During oral argument of this appeal, the defendant requested permission to file a supplemental brief addressing the issue of prosecutorial misconduct in light of our Supreme Court's decision in *State v. Singh*, supra, 259 Conn. 693, which was issued after the briefs in this case were filed. The state joined in that motion. We granted the motion and ordered the defendant to file a supplemental brief of not more than ten pages on or before May 6,

that because the decision in *Singh* had not been issued before the trial in this case and that prior to *Singh*, our Supreme Court had not addressed the propriety of asking a witness to comment on another witness' veracity, the challenged question did not involve "purposeful misconduct or disregard of rulings," and, therefore, it was not improper. Because our Supreme Court stated in *Singh* that the impropriety of asking a witness to comment on another witness' veracity was "well established"; id., 706; we perceive nothing unfair about applying that aspect of *Singh* to the present case. Moreover, "[t]he fairness of the trial and not the culpability of the prosecutor is the standard for analyzing . . . claims of . . . prosecutorial misconduct"; (internal quotation marks omitted) *State* v. *Chasse*, 51 Conn. App. 345, 355, 721 A.2d 1212 (1998), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999); and, therefore, even improper comments that are unintentional nevertheless may amount to prosecutorial misconduct if they deprive the defendant of a fair trial.

In *State* v. *Singh*, supra, 259 Conn. 693, the prosecutor compelled the defendant to characterize other witnesses' testimony as untruthful and then emphasized that testimony during closing argument. Id., 704–705. The court expressly held that questions that require a defendant to comment on another witness' veracity are improper because they invade the province of the jury and create the risk that the jury may conclude that to acquit the defendant, it must find that the other witness lied, and because such questioning distorts the state's burden of proof. Id., 707–709. The court noted that "[t]he state's objective of highlighting inconsistencies in testimony may be accomplished by other, proper means." Id., 711. The *Singh* court also concluded that "closing arguments providing, in essence, that in order

2002, and the state to file a responsive brief no later than five days after the defendant filed his brief.

to find the defendant not guilty, the jury must find that witnesses had lied, are similarly improper." Id., 712.

In the present case, as in *Singh*, the prosecutor improperly compelled the defendant to comment on the veracity of other witnesses and later emphasized that testimony during rebuttal argument.[14] In fact, it fairly can be argued, as the defendant does, that the prosecutor's comments during rebuttal argument implied, *in essence*, that to find the defendant not guilty, the jury must find that the state's witnesses had lied. Such comments are improper. Because the prosecutor's conduct in this case fell within those prohibited categories, we conclude that his questions and comments were improper.

B

The defendant next claims that the prosecutor improperly expressed his personal opinion during closing argument. We agree.[15]

[14] The state concedes that the prosecutor's conduct was improper under *Singh*. It contends, however, that, given that case's presumption that such questions invade the province of the jury, that would seem to inure to the defendant's benefit because, as the state argues, "if the jury accepted the defendant's credibility assessment, it would reject the testimony of state witnesses." We unequivocally reject the state's argument because to endorse it would turn *Singh* on its head.

[15] We note that the state argues that we should not review the defendant's claim because he did not raise it properly in his initial brief and, although he did raise it in his supplemental brief, the claim is not dependent on *State* v. *Singh*, supra, 259 Conn. 693, and, therefore, it went beyond the scope of this court's order for supplemental briefing. See footnote 13. We agree with the state that *Singh* had no effect on the well settled principle that a prosecutor should not give his or her personal opinion as to the credibility of witnesses or as to the defendant's guilt. See *State* v. *Whipper*, supra 258 Conn. 263. We nevertheless review the defendant's claim because he did raise the issue of improper expression of personal opinion in his initial brief and merely elaborated on it in his supplemental brief. Moreover, no injustice is done to the state by our decision to review the claim because we permitted the state to file its supplemental brief five days after the defendant filed his brief. We granted the state the additional time so that it could respond properly to the defendant's claims, and the state did address that and other claims in its supplemental brief.

"It is well settled that, in addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of the argument. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"The parameters of the term zealous advocacy are also well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) Id., 712–13.

Early in his closing argument, the prosecutor stated: "I'm summarizing all the various witnesses' testimony from my perspective and [the] evidence that went in." He went on to state: "Now, the defendant, as he's walking, has this attitude. He wasn't scared. You know why he wasn't scared? Because he had this gun in his hand in his pocket. He wasn't afraid. He knew what he was going to do. . . . He says he was scared. He was not scared. I submit to you, Danger wasn't scared. Danger is his name, he had a gun, he was on a mission, and he was going to complete his mission. . . . Danger was about to injure someone and kill."

Shortly thereafter, the prosecutor again improperly expressed his personal opinion when he argued: "[The defendant] had the murder weapon under the hoodie, under the hoodie, in the hoodie. It doesn't matter. It was on his waist. He clearly says he pulled the weapon and he fired. Was there intent there? Yes, I say there was. He knew what he was doing. [He] wasn't frightened. He had a mission. The mission was to kill Mr. Applewhite."

It is apparent from those comments that the prosecutor blatantly was conveying to the jury his personal opinion that the defendant intended to kill Applewhite and was dedicated to his preconceived "mission" to do so. They also unmistakably suggested to the jury the prosecutor's opinion as to who was the initial aggressor.

Further on in his closing argument, the prosecutor, despite conceding that credibility was for the jury to determine, nevertheless gave his opinion as to the defendant's credibility when he stated: "Even yesterday, his testimony, parts of his statement, were lies, he said. Did he also lie in his testimony to help himself? I don't know. You determine that. *I question his credibility*, but that's up to you to determine." (Emphasis added.) Later, the prosecutor elaborated on that theme by stating: "[The defendant] [c]an't read or write, but can spell Danger. . . . Danger can spell his name, and he can lie to change facts. That's by his testimony. *Danger knows what he did. We know what he did.*" (Emphasis added.)

Although the defendant did admit that he lied as to certain portions of his statement to the police, such an admission does not render moribund the rule against a prosecutor expressing his personal opinion to the jury, and it certainly does not give the prosecutor carte blanche to express his opinion as to the defendant's credibility. "[W]hile prosecutors are not required to describe sinners as saints, they are required to establish

the state of sin by admissible evidence . . . ." (Internal quotation marks omitted.) *United States* v. *Sanchez*, 176 F.3d 1214, 1222 (9th Cir. 1999). The point being that the prosecutor should not do by indirection what he is forbidden to do directly, i.e., give his personal opinion. Here, not only did the prosecutor improperly express his personal opinion as to the defendant's credibility and guilt, but he also implied that the jury already had determined such issues prior to its deliberating on them.

In concluding his closing argument, the prosecutor again expressed his opinion when he stated: "A man is dead and one is injured. This [gun] did it, and it was in [the defendant's] hands. Doesn't matter, the patterns of guns, whether he fired it Hollywood style, TV style, whether he fired it one-handed, whether he says he didn't move the gun or not. Two people were shot, one was killed. It doesn't matter how he fired it or whatever. . . . He admitted he shot both victims and he fled the scene. . . . All the state's witnesses point to Danger. He committed the crime, he knows he was the aggressor, he could have retreated, he was not justified in using deadly force, not at all. It doesn't matter who they are, these victims, or what they did prior to the day of [the shooting]."

Similarly, in rebuttal argument, the prosecutor stated: "The defendant admitted he shot. I don't care where the truck was. A man is dead. He got shot. He was killed. . . . If these men were streetwise, as they're saying, and had a gun, they would have used it, I submit to you. They didn't have a gun. . . . I'm not denying the records that these individuals had, but they weren't out to do any harm to [the defendant].

\* \* \*

"Whether [the victims] were close or far away, it doesn't matter. They were shot by the aggressor. . . . [The defendant] could have left. [The defendant] did

not retreat. [The defendant] . . . was not justified in firing those shots."

Those comments clearly were improper. It is for the jury, not the prosecutor, to decide what "doesn't matter" and whether the defendant was the aggressor, whether the defendant could have retreated and was justified in using deadly force, and whether the victims intended to harm the defendant or had guns. All those factual issues were essential to the defendant's claim of self-defense, which was the crucial disputed issue in the case.

We conclude that the prosecutor repeatedly expressed his personal opinion during closing argument. Such expressions of personal opinion are not an appropriate way to highlight the evidence presented or to suggest a reasonable conclusion that could be drawn by the jury; see State v. Hampton, 66 Conn. App. 357, 373, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 992 (2001); but rather constitute a form of unsworn testimony that is difficult for the jury to ignore because of the prosecutor's special position in the judicial system.

C

Last, the defendant claims that the prosecutor improperly appealed to the jury's passions, emotions and prejudices as a result of "numerous instances" of inappropriate conduct. He argues that the prosecutor's "sarcastic and belligerent" conduct was so egregious and pervasive that the court was compelled to admonish him strongly and to raise the possibility of holding him in contempt if he continued such conduct. We agree.[16]

---

[16] We note that the state argues that we should not review the claim because the defendant did not raise it properly in his initial brief and, although he did raise it in his supplemental brief, the claim is not dependent on Singh, and, therefore, it went beyond the scope of this court's order for supplemental briefing. We review the claim for the reasons set forth in footnote 15.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 719.

During the state's cross-examination, the defendant testified that some of the differences between his statement to the police and his testimony at trial were because the police had put words in his mouth. In response, the prosecutor asked the defendant if the police had "beat him up," and the defendant answered, "No." Defense counsel objected on the ground that the question was inflammatory and outside the evidence. The court sustained the objection and instructed the jury to disregard the prosecutor's question because there was "no testimony concerning physical intimidation by the police." The court also told the jury not to speculate "as to what an answer would have been."

On another occasion during cross-examination, the following colloquy occurred:

"[Prosecutor]: Did you say Mr. Ibscher had a gun, too?

"[Defendant]: Nope.

"[Prosecutor]: Why did you shoot him?

"[Defendant]: He was in the way. He probably got shot on his own.

"[Prosecutor]: Oh, he was in the way."

At that point, the court asked the prosecutor to approach the bench. The prosecutor complied and conferred with the court off the record. The court then instructed the jury to disregard the prosecutor's comment, to concentrate on the question and issues, and that any additional comments by the prosecutor were irrelevant and "not part of the jury's consideration."

Despite the state's disingenuous argument that the printed transcript does not clarify what the prosecutor meant to convey by stating, "Oh, he was in the way," we are satisfied that the comment was improper, whether it is characterized as cavalier, sarcastic or merely insensitive. Indeed, the court, which could gauge the tenor of the trial, as we on the written record cannot, believed that the comment was sufficiently improper to warrant giving the jury a corrective instruction.

Thereafter, the prosecutor asked the defendant whether, in his written statement to the police, he had stated that he put the clothes he was wearing during the shooting into the garbage. The defendant answered: "I said I took them off. I never said I threw them away." In response, the prosecutor stated: "Oh, okay. What did you do with them?" Defense counsel immediately objected to that comment, stating: "Again, that's the fourth time, Your Honor." As the prosecutor began to apologize for his comment, the court interrupted and excused the jury.[17]

After the jury was excused, the following colloquy occurred between the prosecutor and the court:

"[Prosecutor]: My apologies, Your Honor. I—

"[Court]: Counsel, what do I have to do to get these comments to stop?

---

[17] The court stated: "I'm going to have the jury excused again. And please, don't speculate, no discussions, no deliberations. In fact, you can take a whole fifteen minutes recess right now."

"[Prosecutor]: I'm—that was not—

"[Court]: Do I have to hold you in contempt?

"[Prosecutor]: No, Your Honor. I apologize to the court. I did not mean that. It was a reaction. I'm sorry.

"[Court]: That's why you're going to take a fifteen minute recess as well. You're going to gather your thoughts. You're going to come back and conduct a proper cross-examination without gratuitous comments, counsel. This is too important to be having gratuitous comments.

"[Prosecutor]: I understand, Your Honor."[18]

At that point, defense counsel requested that the court impose sanctions on the prosecutor if his misconduct continued.[19] After the jury returned to the courtroom, the court gave a curative instruction.[20]

---

[18] Later, the prosecutor again apologized to the court for his comment, stating: "That last one was just knee-jerk, Your Honor, and I totally apologize."

[19] Defense counsel stated: "May—I have a suggestion. If it happens again, could we have a sanction because this has been happening time and time again. We get an apology. It's always, I'm sorry, I made a mistake. It's getting to the point where it's starting to add up, and it's getting prejudicial to my client. I haven't really spoken up to this point yet. In fact, coupled with yesterday when counsel said that I never showed him a piece of evidence, which is the map that's up there, when I did. In front of the jury he said that, making it look as if I'm deceitful in hiding something. I wanted to put that on the record, too."

As the prosecutor tried to interject a comment, defense counsel continued by stating: "And now—if I can finish. It's time and time again, I'm sorry, I asked the wrong question, I made comments, I'm sorry. It's getting to the point where it's starting to prejudice [the defendant]. It's making me look bad, and it leaves an impression with the jury, especially when he said I didn't show him a map when I clearly did."

[20] The court instructed the jury as follows: "Ladies and gentlemen of the jury, you may all recall during the voir dire process before the trial started, I instructed you as to your roles as jurors, my role as the court and counsels' role in argument. Once again, you're to find the facts, draw conclusions as to the ultimate facts based upon the testimony and evidence that is introduced in the courtroom. You can't rely on guesswork, conjecture, suspicion; you can't be influenced by personal likes, dislikes, opinions, prejudices or sympathies. *I'm also going to caution you, you can't be influenced by the*

Here, the prosecutor's conduct was so egregious that the court felt compelled to admonish him and to raise the possibility of holding him in contempt if he did not cease his misconduct. The court's contempt threat was a serious and grave measure obviously designed to put an end to the prosecutor's "gratuitous comments." The implication clearly is that, insofar as the court was concerned, this was not an isolated instance of misconduct by the prosecutor, and hanging the potential of contempt over the prosecutor's head was a last resort measure to compel him to cease his repeated misconduct.

The prosecutor's misconduct was not confined to his cross-examination of the defendant, but rather it continued during final argument. During his final argument, the prosecutor repeatedly used the defendant's nickname, "Danger," when referring to the defendant. By our count, the prosecutor referred to the defendant as "Danger" at least eighteen times in closing argument[21]

---

*questions or the form of questions by counsel or by counsel's demeanor in a particular case. Every witness in this case was entitled to the same consideration, the same deference, the same respect.* You are to listen to every witness and judge the credibility of each witness based upon the same standard. Any comments, counsel?" (Emphasis added.) There were no comments.

[21] During closing argument, the prosecutor stated in relevant part: "It was the day before Thanksgiving . . . . Some people, Michael Ibscher, Barrett Applewhite, were getting ready. They were in a holiday mood. . . . But real danger lurked around the corner in the name of [the defendant]. That's who it is. That's Danger.

\* \* \*

"At that point, Michael Ibscher looks to his left and in front of him, and he sees Danger . . . . Danger crosses the street in front of the vehicles and there's testimony . . . that he approaches the vehicle. . . . Mr. Applewhite sees that, Mr. Ibscher hears at one point the defendant, Mr. Danger, saying, 'What, what?' as he's backing up. . . .

"Now, the defendant, as he's walking, has this attitude. He wasn't scared. You know why he wasn't scared? Because he had this gun in his hand in his pocket. He wasn't afraid. He knew what he was going to do. . . . The 'What, what?' Mr. Ibscher and other people testified [about] that's sort of like a beware, kind of heads up . . . . I recall when I was a kid, there was a movie, 'Lost in Space.' . . . And the robot would always say, when there

and four times in rebuttal argument.[22] By his repeated use of the nickname, "Danger," the prosecutor blatantly undertook to appeal to the jury's emotions, passions and prejudices.[23]

was trouble, 'Danger, danger, Will Robinson.' There was danger. There was trouble. . . . He says he was scared. He was not scared. I submit to you, Danger wasn't scared. Danger is his name, he had a gun, he was on a mission, and he was going to complete his mission. Danger admitted on testimony he knew guns killed. . . . Danger was about to injure someone and kill. . . .

"Mr. Applewhite walks to the end of the vehicle, across the street . . . there's [the defendant], Danger.

\* \* \*

"Mr. Ibscher gets shot again from behind, his back, and he attempts to run. [The defendant], when I asked him, 'Danger, why did you run?' He said, 'Because they ran.'

\* \* \*

"Now, you heard [Hartford police] Detective [James] Rovella. He read [the written statement] to [the defendant], talked to him. Danger said he couldn't read or write. . . .

"Oh, and denied he was called Danger to Detective Rovella. Danger is his name. We know that. Can't read or write, but can spell Danger. He said to me, 'Oh, the reason I have Danger, you just add g-e-r to d-a-n and that spells Danger.' Yes, it does spell Danger. . . . He was proud of that name, my position is. Danger can spell his name, and he can lie to change facts. . . . Danger knows what he did. We all know what he did.

\* \* \*

"There's no question Mike Ibscher was injured and Barrett Applewhite was killed. All the state's witnesses point to Danger. . . .

"Michael Ibscher is injured for life; Barrett Applewhite is dead. Both injury and death were caused by one person and one person alone. Danger. [The defendant]. Thank you."

[22] During rebuttal argument, the prosecutor stated in relevant part: "Danger couldn't read or write. He was surely world-wise though at eighteen. He knew what he was doing. He knew that gun killed. He knew it injured. He can lie when he wanted to fit his story, to change it on the [witness] stand from his statement.

\* \* \*

"Barrett Applewhite and Michael Ibscher will never celebrate Thanksgiving together with family and friends. Again, his family and friends will always remember November 26, 1997. That was the day that Danger Dan shot Michael Ibscher and murdered Barrett Applewhite. Danger was lurking in the street, and Danger shot . . . Michael Ibscher . . . and murdered Barrett Applewhite. There's no question about that. Thank you."

[23] The state contends that it properly referred to the defendant as "Danger" because the court allowed evidence of that nickname for the purpose of

In the past, we have afforded prosecutors great latitude as to "the limits of legitimate argument" and "the zeal of counsel in the heat of argument"; (internal quotation marks omitted) *State* v. *Whipper*, supra, 258 Conn. 252; but that latitude cannot go unbridled. Although we have recognized that closing arguments " 'often have a rough and tumble quality about them' " and that " 'some leeway must be afforded to the advocates' "; *State* v. *Hampton*, supra, 66 Conn. App. 373; we will not sanction a verbal free-for-all. Here, the prosecutor's drumbeat repetition of "Danger" clearly went beyond the limits of legitimate argument. It is obvious to us that the prosecutor's purpose in referring to the defendant as "Danger" was to portray him as a dangerous and violent person. Such ill-disguised insinuation is unacceptable and designed solely to appeal to the jury's emotions, passions and prejudices.

## D

We finally consider whether the cumulative effect of the prosecutor's conduct that we have concluded was improper "so infected the proceedings as to deprive the defendant of his right to a fair trial." *State* v. *Yusuf*, 70 Conn. App. 594, 633, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002). That final determination requires, as we have stated, the consideration of several factors: The extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the

showing how the police first came to suspect the defendant and that the court later agreed that the defendant's denial to the police that he went by that alias was relevant to show consciousness of guilt. It is true that the court permitted evidence of the nickname, "Danger," for those two limited purposes; however, that did not give the state license to blatantly appeal to the jury's emotions, passions and prejudices by insinuating that the defendant was a dangerous and violent person simply because he was known to some by the nickname "Danger."

case, the strength of the curative measures adopted and the strength of the state's case. See *State* v. *Whipper*, supra, 258 Conn. 262–63. We conclude that the defendant was deprived of a fair trial.

Our conclusion is based, first, on the fact that for the most part, the prosecutor's misconduct was not invited by the defense. Second, the misconduct was severe and frequent, as demonstrated by the fact that the court was compelled to admonish the prosecutor strongly and to raise the possibility of holding him in contempt if he continued such misconduct. Indeed, this was not a case where the misconduct consisted of a single, isolated episode, but, rather, the misconduct occurred throughout the prosecutor's cross-examination of the defendant and during closing and rebuttal arguments. In addition, our Supreme Court has noted that "improper statements during closing arguments may have a profoundly serious effect because they are [a]mong the final words of persuasion the jury [hears] before deliberation . . . ." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 464, 797 A.2d 1088 (2002).

Furthermore, the prosecutor's misconduct directly addressed the critical issues in the case, namely, the credibility of witnesses and the defendant's claim of self-defense. This was not a "who done it" case. What really was at issue was the defendant's reason for shooting the victims. The prosecutor compelling the defendant to characterize other witnesses' testimony as untruthful and then highlighting that testimony in his rebuttal argument, his improper expressions of personal opinion as to such issues as whether the defendant was the aggressor, was on a mission, was justified in using deadly force, was not scared and could have retreated, and whether the victims intended to harm the defendant or had guns, and his drumbeat repetition of the defendant's nickname, "Danger," all clearly implicated the central issues in the case.

Although the court provided curative jury instructions beyond its general instructions, this prosecutor's misconduct was so pervasive and egregious that we are not persuaded that the court's instructions were sufficient to cure the substantial prejudice caused by the misconduct.

Finally, although it fairly can be said that the state's case was relatively strong, the evidence of guilt was not so overwhelmingly strong that the prosecutor's misconduct could not have improperly influenced the jury. See *State* v. *Couture*, 194 Conn. 530, 564, 482 A.2d 300 (1984) ("[a]ppeals to passion and prejudice may so poison the minds of jurors even in a strong case that an accused may be deprived of a fair trial"), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).[24] Although the defendant admitted that he shot both victims, he also raised a legitimate defense of self-defense, and his efforts to advance that defense were, at the very least, substantially hindered by the prosecutor's misconduct, especially during closing argument.[25] We cannot conclude that had the jury not been exposed to the prosecutor's misconduct, it would have concluded that the evidence proved beyond a reasonable doubt that the defendant did not act in self-defense when he shot the victims.[26]

Accordingly, after a careful review of the record, we conclude that the cumulative effect of the prosecutor's

---

[24] We further note that our constitution does not condition constitutional rights on guilt or innocence; *State* v. *Couture*, supra, 194 Conn. 563; and it certainly does not stand for the proposition that in a strong case against a defendant, he or she is not entitled to a fair trial and, therefore, anything goes. As our Supreme Court has stated metaphorically: "The prosecutor cannot pollute the waters and then claim that we should ignore his actions because the fish are not worth saving." Id., 564.

[25] We note that a "prosecutor must not demean legitimate defenses available under the law." *State* v. *Hinds*, 485 A.2d 231, 237 (Me. 1984).

[26] See footnote 7.

misconduct so infected the proceedings as to deprive the defendant of his right to a fair trial.

## II

We next consider the defendant's claim that the court incorrectly found certain essential facts in denying his motion to suppress his statement to the police and, therefore, a plenary review of its denial of his motion is warranted.[27] We disagree.

The following additional facts are relevant to our analysis. At trial, the defendant filed a motion to suppress "any and all" statements that he allegedly had made to the police on the grounds that (1) he was not properly advised of his constitutional rights, (2) he did not make a knowing, voluntary and intelligent waiver of his privilege against self-incrimination or of his right to counsel and "other constitutional rights," (3) the statements were not given voluntarily and (4) the statements were the result of an illegal arrest.

On February 11, 2000, the court held an evidentiary hearing on the defendant's motion to suppress. During that hearing, the state introduced testimony from Timothy Pitkin, James Leitao, and James Rovella, the three detectives who conducted the defendant's custodial interrogation. The defendant did not testify. After the hearing, the court denied the defendant's motion to suppress, concluding that he had been advised properly of his constitutional rights, that he unconditionally waived his rights under *Miranda* v. *United States*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), that he knowingly and voluntarily waived those rights, that his statements were given voluntarily and that there

---

[27] As previously stated, we address the defendant's claim because the issue is likely to arise in the new trial.

was no evidence to suggest that his arrest was in any way illegal.[28]

It is well established that "[t]he trial court's determination of the historical circumstances surrounding the

[28] The court memorialized its decision denying the defendant's motion to suppress in an extensive and comprehensive memorandum in which, inter alia, it made the following factual findings: "During the evening hours of November 26, 1997, in the area of 39 Wadsworth Street, Hartford, Connecticut, Barrett Applewhite and Michael Ibscher were shot. Mr. Applewhite died shortly thereafter. Based upon information provided by eyewitnesses at the scene, police officers secured a warrant for the defendant's arrest.

"Shortly before 3 p.m. on December 1, 1997, in the company of his mother and brother, the defendant surrendered himself at the Hartford police department. Detectives Timothy Pitkin and Jack Leitao first obtained some brief biological information. They next advised the defendant of his rights pursuant to *Miranda* v. *Arizona*, [supra, 384 U.S. 436]. Detective Pitkin read the defendant the *Miranda* rights from a standard acknowledgment form.

"Although the defendant had an eighth grade education, he was functionally illiterate. The defendant was eighteen years old. He had been born in Chicago; he understood the English language. He did not appear to be under the influence of any drugs or alcohol. He appeared to be medically healthy.

"Aware that the defendant could neither read nor write English, the detectives read each paragraph of the waiver and, after each, ensured that the defendant understood the particular right. Although he acknowledged each of his rights, the defendant refused to sign that form.

"Detectives Pitkin and Leitao then led the defendant to an interrogation room. The room, constructed of cinder block, measured eight feet by ten feet. That first interrogation room contained a table and some chairs, but did not have any bathroom. In compliance with the defendant's request, the detectives advised the defendant's mother and brother that he was in custody and was not free to leave. The defendant's family left the police station. The detectives then returned to the interrogation room.

"There was no question that the defendant was in custody pursuant to the outstanding arrest warrant. The detectives advised the defendant of the charges against him. Between 3 p.m. and 4:30 p.m., the detectives advised the defendant of some of the information that had been developed in support of those charges. The detectives, who remained together during the entire interview procedure, left the defendant alone for a period of time, to 'give him some space,' but informed the defendant they would return. The interview continued when the detectives returned to the interrogation sometime after 5 p.m. From 3 p.m. to 5 p.m., the defendant denied any involvement with the crimes.

"Throughout the interview, the detectives monitored the defendant's physical and verbal responses and his demeanor. At no point during the interview process did the defendant request an attorney. The defendant never asked

defendant's interrogation are questions of fact . . . which will not be overturned unless they are clearly erroneous." (Citation omitted; internal quotation marks

to terminate the interview process. The defendant was offered food and beverage. He had access to bathroom facilities and a telephone. He was neither shackled nor handcuffed. The detectives neither threatened the defendant, isolated him from his family nor showed him photographs of the victims. At one point, the defendant asked the detectives what would happen if he provided his version of the events to which the officers replied that they would have to investigate all information provided.

"During the afternoon, the defendant asked to use the bathroom. Consequently, the detectives changed interrogation rooms. This second room had a one-way mirror. Sometime between 5:30 p.m. and 6 p.m., the defendant requested some food and drink. The detectives again left the defendant alone in the interrogation room. After a period of time, the defendant held his face in his hands and began crying. At this point, Detective Rovella, who heard the defendant crying, sought permission to speak with the defendant. Thereupon, Detective Rovella entered the interrogation room.

"Using a soft conversational tone, Detective Rovella calmed the defendant, who, within five to ten minutes, stopped crying. The defendant appeared to be sober and coherent. He did not appear to be distracted. He was not unduly emotionally distraught. He was neither shackled nor cuffed. The defendant denied any drug or alcohol use.

"Detective Rovella again advised the defendant of his *Miranda* rights. Each paragraph of the advisement was individually read by the detective and then acknowledged by the defendant, who signed each paragraph. The defendant indicated that he understood all of his rights. Further, he told the officers he was familiar with police procedures.

"Encouraged by Detective Rovella to tell the truth, the defendant gave the statement he now challenges. Before the defendant gave that statement, he had stopped crying. While making the statement, he consumed the food and beverage provided by the officers. He was calm, quiet and relaxed. He never asked to terminate the interview. He never asked to see a lawyer. Detective Rovella gave neither promises nor inducements. He did not discuss any potential penalties with the defendant. He did not threaten to isolate the defendant from his family.

"Detective Rovella used a laptop computer to record the defendant's statement. The statement was typed as it was given by the defendant. As he typed, Detective Rovella read the written statement to the defendant, who offered some corrections before he initialed the final form and swore to the statement's accuracy. Finally, Detective Rovella photographed the defendant. . . . This entire process concluded at 9:04 p.m.

"After he completed his statement, the defendant called his family. His mother, brother, girlfriend and children came to the police station to meet him. The defendant then consented to a search of his apartment. At no time did the defendant tell any of his family members that he had been coerced."

omitted.) *State* v. *Pinder*, 250 Conn. 385, 410, 736 A.2d 857 (1999). "A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *Mongillo* v. *Mongillo*, 69 Conn. App. 472, 476, 794 A.2d 1054, cert. denied, 261 Conn. 928, 806 A.2d 1065 (2002). The court's legal conclusions, or the applicability of the law to the facts in this context, is subject to plenary review. See *State* v. *Pinder*, supra, 411.

The defendant first claims that the court's finding that he surrendered himself to the police "[s]hortly before 3 p.m. on December 1, 1997," was incorrect and, therefore, its finding that "the detention prior to the defendant's confession lasted approximately five hours" also was incorrect. We are not persuaded.

To support his claim, the defendant asserts that at trial, Leitao testified that "the defendant had come to the police station at about 1 p.m. that day," and Pitkin testified that he did not know what time the defendant arrived. Our careful review of the record reveals that Leitao actually testified that he was *told* that the defendant had arrived at the station at 1 p.m. Moreover, Rovella testified that the defendant arrived "some time around 3 [p.m.] or after."[29] We conclude that there was evidence to support the court's finding that the defendant arrived at the police station shortly before 3 p.m. and, therefore, it was not clearly erroneous. Accord-

---

[29] In addition, Pitkin testified that although he did not know when the defendant arrived at the police station, it was probably not too long before 3 p.m. because, otherwise, he would have been notified.

ingly, we further conclude that the court's finding that "the detention prior to the defendant's confession lasted approximately five hours" was not clearly erroneous.[30]

The defendant also claims that the court's findings with respect to the timing of certain events that occurred after he arrived at the police station were incorrect. Specifically, he challenges the court's findings as to when he denied involvement in the crimes, when he requested food and when the police advised him concerning some of the information that had been developed in support of the charges against him.[31]

Even though there may be some minor time discrepancies concerning when those relatively insignificant events occurred, because the defendant does not claim that the specific events did not in fact occur, under the circumstances, the challenged findings were not clearly erroneous.[32] Accordingly, we conclude that a plenary review of the court's denial of the defendant's motion to suppress is not warranted.

### III

We next consider the defendant's claim that the court improperly permitted the state to use evidence of the his post-*Miranda* silence against him in violation of

[30] We note that according to the defendant's written statement, he gave that statement to the police from about 8:50 p.m. to 9:40 p.m. and, therefore, technically, the detention period prior to the defendant giving his confession lasted approximately five hours and fifty minutes. We do not find that difference significant.

[31] The defendant claims that from 3 p.m. to 5 p.m., he did not deny involvement in the crimes, but rather that he did so from 3 p.m. or 4 p.m. to 6 p.m. He claims that he did not request food between 5:30 p.m. to 6 p.m., but rather that he did so at 7:30 p.m., and that he was not advised of the information against him between 3 p.m. to 4 p.m., but rather that he was so advised sometime after 6 p.m.

[32] We note that even if we were to accept the defendant's timing of those events or to exclude them altogether from the dozens of factual findings made by the court, that difference, in our opinion, would not undermine the court's ultimate decision to deny the defendant's motion to suppress.

*Doyle* v. *Ohio,* supra, 426 U.S. 610. We are not persuaded.

Although the defendant failed to preserve his claim properly at trial, he nevertheless maintains that it is reviewable under *State* v. *Golding,* supra, 213 Conn. 233.[33] We will review the claim under *Golding* because the record is adequate to do so, and the alleged violation is of constitutional magnitude.

"Ordinarily, evidence of a defendant's postarrest and post-*Miranda* silence is constitutionally impermissible under the due process clause of the fourteenth amendment. *Doyle* v. *Ohio,* [supra, 426 U.S. 610]." (Internal quotation marks omitted.) *State* v. *Berube,* 256 Conn. 742, 750, 775 A.2d 966 (2001). "The factual predicate of a claimed *Doyle* violation is the use by the state of a defendant's postarrest and [post-*Miranda*] silence either for impeachment or as affirmative proof of his guilt." *State* v. *Joly,* 219 Conn. 234, 256, 593 A.2d 96 (1991). "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." (Internal quotation marks omitted.) *State* v. *Montgomery,* 254 Conn. 694, 713, 759 A.2d 995 (2000).

The defendant claims that "there is no evidence whatsoever that [he] expressly waived his right to silence until he executed the written waiver form" and, therefore, the court improperly admitted evidence of his initial refusal to sign the waiver of rights form, his initial denial of any knowledge of the shooting and his crying in the interview room.[34] In support of his claim, the

---

[33] See footnote 10.

[34] The defendant concedes that the state did not use evidence of his post-*Miranda* silence to impeach his trial testimony, but nevertheless asserts that the state did use it as affirmative proof of his guilt.

defendant asserts that "the trial court simply did not address the admissibility of [his] refusal to sign the [waiver] form in its memorandum of decision [on his motion to suppress], nor did it address [his] denial of knowledge of the crime."

The defendant's *Doyle* claim essentially is an attack on the court's denial of his motion to suppress. In denying that motion, however, the court clearly determined that the defendant had "unconditionally waived his *Miranda* rights," both initially, by voluntarily speaking with Pitkin and Leitao, and subsequently, by giving a written statement to Rovella. Indeed, the court, citing *State* v. *Harris*, 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983), specifically concluded that the defendant's "expressed willingness to speak constituted an explicit act evidencing waiver," which it found "persuasive, despite the defendant's initial failure to sign any waiver form." The court's decision, therefore, encompassed the admissibility of "any and all" statements that the defendant had made to the police, and his assertion to the contrary wholly is without merit.

In pressing his claim, the defendant further asserts that the court's reliance on *Harris* was misplaced because that case is inapposite and, therefore, the court's conclusion that his "expressed willingness to speak constituted an explicit act evidencing waiver" was incorrect. We do not agree.[35]

[35] In his appellate brief, the defendant cites *State* v. *Daugaard*, 231 Conn. 195, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995), which he claims "compels" the conclusion that a *Doyle* violation occurred in the present case. In *Daugaard*, the state introduced evidence that the defendant had refused to waive his rights, refused to consent to a body search and requested a lawyer. In the present case, the state did not introduce evidence that the defendant refused to *waive* his rights, but rather that although the defendant initially refused to *sign* a written waiver of rights form, he nevertheless orally agreed to waive his rights. *Daugaard* therefore is inapposite, and the defendant's reliance on it is misplaced.

In *State* v. *Harris*, supra, 188 Conn. 578, the defendant, after being read his *Miranda* rights, refused to sign a waiver form, but agreed to discuss the incident with the police. Thereafter, the defendant proceeded to make oral statements that placed him at the crime scene; however, he was unwilling to make a written statement before consultation with a lawyer. Id. Our Supreme Court concluded that the defendant's expressed willingness to speak constituted an explicit affirmative act evidencing waiver, which the court reasonably could find persuasive despite the defendant's refusal to sign the waiver form. Id., 580. The court reasoned that "[r]efusal to sign a waiver form or a written statement, although some evidence of the absence of waiver, may be outweighed by affirmative conduct indicative of a knowingly and intelligently made decision not to remain silent . . . ." Id., 581.

The defendant attempts to distinguish *Harris* by arguing in his principal brief that unlike the situation in the present case, the defendant in *Harris*, after refusing to sign the waiver form, "*directly* proceeded to make an inculpatory oral statement to the police . . . ." (Emphasis added.) The defendant's argument is unavailing because the fact that, here, the defendant did not give a statement *immediately* after he refused to sign the waiver form does not undercut *Harris'* applicability to the present case. The important consideration under *Harris* is not the immediacy of the defendant's statement after his refusal to sign the waiver form, but rather, whether despite the defendant's refusal to sign the waiver form, his subsequent willingness to speak to the police nevertheless constituted "an explicit affirmative act evidencing waiver."

In the present case, as in *Harris*, although the defendant refused to sign the waiver form, he nevertheless indicated that he was willing to cooperate and agreed to speak with the police and answer questions. Moreover,

when he spoke with the police, the defendant did not request a lawyer, nor did he indicate that he did not want to talk any further. The defendant, therefore, did not refuse to waive his rights as he claims, but initially merely refused to memorialize that waiver in writing. "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative; *State* v. *Madera*, [210 Conn. 22, 50, 554 A.2d 263 (1989)]; and under the circumstances of this case, may be construed as an affirmative act evidencing waiver." (Internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 322, 715 A.2d 1 (1998).

After a scrupulous examination of the record, we conclude that the court properly relied on *Harris*, and its conclusion that the defendant waived his right to silence is supported by substantial evidence. See *State* v. *Harris*, supra, 188 Conn. 580. Accordingly, the defendant's claim that a *Doyle* violation occurred is without merit because where, as here, the defendant expressly waives his right to remain silent, there is no *Doyle* violation.[36]

IV

We finally consider the defendant's claim that the court improperly admitted evidence regarding his nick-

[36] We note that even if we assume arguendo that a *Doyle* violation occurred, the result would be the same because, in our opinion, it was harmless beyond a reasonable doubt. "A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's [post-*Miranda*] silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases wherein the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Citations omitted; internal quotation marks omitted.) *State* v. *Daugaard*,

name, "Danger," and testimony that he denied using that nickname. We are not persuaded.

The following additional facts are relevant to our analysis. After the court denied the defendant's motion to suppress, it heard argument on his motion in limine. In that motion, the defendant sought to preclude the state from introducing evidence of his nickname "Danger," as well as certain photographs taken of his bedroom that showed the names "Lovely and Danger" written on the closet door and bedpost. The state argued that the evidence of the defendant's nickname was necessary to explain to the jury how the police came to focus on the defendant as a suspect. The court stated that it would take the issue under consideration.

Prior to the start of the evidence, the state asked the court to address the nickname issue because its first witness knew the defendant only by his nickname and would refer to the defendant by that name in his testimony. The state also reiterated that the police first came to focus on the defendant as a suspect on the basis of his nickname. In addition, the state said that it would introduce photographs of the defendant's bedroom to impeach the defendant's credibility.

In response, the defendant argued that the police already knew his identity from his statement and, therefore, there was no need to confirm his nickname through the photographs. He also argued that evidence of his nickname was prejudicial and that there were other ways to determine his identity. The court ruled that evidence concerning the nickname "Danger" was admissible for the purpose of establishing the defendant's identity, but that it would address the admissibility of the photographs when that issue arose at trial.

231 Conn. 195, 212–13, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995).

During trial, a number of witnesses testified concerning the defendant's nickname. Ibscher testified that at the time of the shooting, he did not know the defendant's last name, but did know him by the name "Danger." Castro, Gomes and Pitts also testified that they knew the defendant as "Danger." Jackson testified that the man she observed shooting the victims was "Danny" or "Danger," but that she did not know his last name.

Officer Martin Miller, who was the first police officer to arrive at the scene of the shooting, testified that Ibscher and another witness identified the suspect as "Dangerous Danny." Miller stated that initially he thought that the suspect might be a person he knew named Daniel Rodriquez, who had once given Miller that nickname. During Miller's testimony, the court, sua sponte, gave the following cautionary instruction to the jury: "There has been testimony concerning a nickname that was given by several people in the case. It's a nickname only. Accept it as that only. Draw no inferences from nicknames that might be given to people in this case."

Pitkin testified that Ibscher knew the suspect by his street name, "Danger Dan" or "Danny." Later, during Pitkin's testimony, the court excused the jury at the state's request at which time the state indicated that Pitkin would testify that he observed the name "Danger" written in the defendant's bedroom. Defense counsel objected to the admission of that testimony on the ground that it was irrelevant. The court, indicating its concern about the relevance of the testimony, asked the prosecutor: "At this point, don't we think that we're getting to the point where it just might become unduly prejudicial?" In response, the state argued that the testimony was relevant because the defendant had denied using the nickname in his statement to the police.[37] The court agreed.

---

[37] Although the state asserted that the defendant had denied using the nickname "Danger" in his written statement to the police, it concedes in

Defense counsel then raised the further objection that because the statement had been given to Rovella, Pitkin should not be permitted to testify about the contents of that statement. At that point, the court permitted a voir dire about whether the defendant also had denied using the name "Danger" to Pitkin. During voir dire, Pitkin testified that the defendant had denied using the nickname "Danger" to him personally. Thereafter, when the jury returned, Pitkin testified that when he asked the defendant if he had used or was known by the name "Danger," the defendant claimed that he was not known by that name. Later, Rovella testified that the defendant also had denied to him having used the nickname "Danger."

Leitao testified that when he was notified that the suspect's nickname was "Danger" or "Danny," he searched through the police department's computer for suspects by accessing all the cases involving a person with those names and, by the process of elimination, came up with the defendant as a suspect.

Finally, the defendant, on cross-examination, admitted that he was known as "Danger" or "Dangerous." He stated, however, that people did not call him that because of the way he behaved and that he did not know what it meant.

We begin by setting forth the appropriate standard of review. "Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great

its appellate brief that that assertion was not accurate. The state, however, maintains that that technical inaccuracy was rendered irrelevant by the fact that at trial, the state adduced police testimony that the defendant orally had denied using that nickname.

weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *McCall*, 62 Conn. App. 161, 166–66A, 774 A.2d 143, cert. denied, 258 Conn. 935, 785 A.2d 231, petition dismissed, 258 Conn. 935, 785 A.2d 232 (2001).

The defendant claims that "the improper and repeated introduction of evidence" concerning his nickname was "irrelevant, unduly prejudicial and inflammatory." Specifically, he argues that the nickname was irrelevant to establish identity because all the witnesses identified him from a photographic array and in court, and his statement to the police conceded that he was the shooter. He also argues that reference to the nickname "Danger" was "highly likely to arouse the jury's emotions" by implying that he was dangerous by nature and that it would distract the jury from the main issue of self-defense. We disagree.[38]

"[E]vidence is relevant only when it tends to establish the existence of a material fact or to corroborate other direct evidence in the case. . . . [T]he test of relevancy is not whether the answer sought will elucidate any of the main issues, but whether it will to a useful extent aid the court or jury in appraising the credibility of the witness and in assessing the probative value of the direct testimony." (Citation omitted; internal quotation

---

[38] The defendant also claims that because the state introduced evidence of his denial of the use of the nickname "Danger" during the trial and not during the suppression hearing, there was no evidence that it was voluntary. That claim is without merit because although the court did not explicitly rule that the challenged statement was voluntary, the court's findings and conclusions in its memorandum of decision on the motion to suppress are applicable. Therefore, when the court concluded in ruling on that motion that the defendant knowingly and voluntarily had waived his *Miranda* rights, then all statements, including the challenged oral statement, constitutionally were admissible.

marks omitted.) *State* v. *Battista,* 31 Conn. App. 497, 513, 626 A.2d 769, cert. denied, 227 Conn. 907, 632 A.2d 696 (1993).

As the court properly ruled, evidence of the defendant's nickname "Danger" was clearly relevant to establish the defendant's identity. Although there is a certain appeal to the defendant's argument that once his identity was established, evidence of his nickname was irrelevant, it overlooks the fact that there were other compelling rationale for the admission of that evidence. For example, it was certainly appropriate to use such evidence to show how the police came to focus on the defendant as a suspect in the case. In addition, evidence regarding the defendant's nickname, including the photographs of his bedroom showing the name "Danger," impeached the defendant's veracity by showing that he had lied to the police about not using that nickname. Indeed, during his testimony, the defendant admitted that he had lied to the police regarding his use of the nickname "Danger." Finally, because many witnesses only knew the defendant by his nickname, it was appropriate not to confine reference to that nickname solely to the issue of identity. We conclude, therefore, that the court properly determined that evidence of the defendant's nickname was relevant despite the fact that other evidence established his identity as the shooter.

With respect to whether the court properly determined that the probative value of the evidence of the defendant's nickname outweighed its prejudicial effect, we conclude that it did.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be

admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 329–30, 746 A.2d 761 (2000).

As we have stated, the court properly concluded that the challenged evidence was relevant, inter alia, to the issues of identity and to the defendant's veracity. Moreover, it is clear that the court was aware of the potentially prejudicial effect of that evidence as evinced by its sua sponte instruction to the jury that it should not draw any inferences from the nickname evidence.[39] We conclude that the court properly determined that the probative value of the evidence regarding the defendant's nickname outweighed its prejudicial effect because that evidence did not improperly arouse the jurors' emotions, especially in light of the court's appropriate cautionary instruction. "It is to be presumed that the jury followed the court's . . . instructions unless the contrary appears." (Internal quotation marks omitted.) *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d

---

[39] The court also indicated its awareness of the potential prejudicial effect of the nickname evidence when it asked the prosecutor: "At this point, don't we think that we're getting to the point where [the nickname evidence] just might become unduly prejudicial?"

246

392 (1999). Accordingly, we conclude that the court did not abuse its broad discretion in admitting the challenged evidence.[40]

The judgment is reversed and the case is remanded for a new trial on the charges of manslaughter in the first degree with a firearm and assault in the first degree.

In this opinion the other judges concurred.

[40] As previously stated, we will not address the defendant's final claim that the court improperly instructed the jury regarding intent with respect to the charge of manslaughter in the first degree with a firearm because that issue is unlikely to arise in the new trial.

